The STATE of Texas, Petitioner,

v.

SOUTHWESTERN BELL TELEPHONE
COMPANY, Respondent.

No. B-5327.

Supreme Court of Texas.

July 9, 1975.

Rehearing Denied Sept. 24, 1975.

John L. Hill, Atty. Gen., Stockton, Fisher & Willatt, Mike Willatt, Austin, for petitioner.

Clark, Thomas, Denius, Winters & Shapiro, Donald Scott Thomas, Austin, Sears & Burns, Will Sears, Houston, Ford W. Hall, Dallas, for respondent.

STEAKLEY, Justice.

Southwestern Bell Telephone Company, Respondent, is a public utility furnishing telephone service to the people of Texas, interstate and intrastate. At this time it is

statutorily unregulated as to the intrastate rates it charges in Texas.[1]

On January 30, 1975, Bell announced a long distance intrastate telephone rate increase to become effective March 1, 1975. It was designed to net Bell additional annual revenue of approximately 45 million dollars. On February 7, 1975, suit was instituted by the Attorney General of Texas in the name of the State of Texas to enjoin the proposed rate increase as unreasonably high. The State sought to temporarily enjoin the effectuation of the announced rate increase, pending final trial. After hearing, the trial court did so. An appeal was taken by Bell and the Court of Civil Appeals rendered judgment dissolving the temporary injunction. We granted writ of error at the instance of the State. We reverse the judgment of the Court of Civil Appeals and reinstate the temporary injunction.

The view stated by the Court of Civil Appeals was that the determination in court sought by the State, i. e., that the rate increase was unreasonably high, called for the exercise of an impermissible legislative function; or, as phrased by the court, would be "tantamount to judicial ratemaking." This was thought to be violative of the separation of powers ordained by Article 2, § 1, of the Texas Constitution, Vernon's Ann.St.[2] 523 S.W.2d 67.

■ We first narrow the issue before us at this stage of the proceeding. We are not now concerned with whether or not, upon final trial, the State will be successful in establishing the unreasonableness of the intrastate rates proposed by Bell. The action under appellate review here is the exercise by the trial court of the discretionary power to hold in abeyance the effectiveness of the rate increase, pending trial, thereby maintaining the status quo. We have defined the status quo as being the last, actual, peaceable, non-contested status that preceded the pending controversy. *Janus Films, Inc. v. City of Fort Worth*, 163 Tex. 616, 358 S.W.2d 589 (1962); *Transport Co. of Texas v. Robertson Transports*, 152 Tex. 551, 261 S.W.2d 549 (1953). We have also said that to warrant issuance of a temporary injunction, the applicant need only show a probable right and probable injury; that the applicant is not required to establish that he will finally prevail in the litigation; that the judgment of the trial court will be upheld unless we are convinced that it represents a clear abuse of discretion; and that there is no abuse of discretion if the evidence tends to sustain the cause of action as alleged. *Oil Field Haulers Ass'n v. Railroad Commission*, 381 S.W.2d 183 (Tex.1964); *Transport Co. of Texas v. Robertson Transports, supra; Texas Foundries v. International Moulders & F. Wkrs.*, 151 Tex. 239, 248 S.W.2d 460 (1952); *Southwestern Greyhound Lines v. Railroad Com'n*, 128 Tex. 560, 99 S.W.2d 263 (1936); Annot. 109 A.L.R. 1235 (1937).

■ We have also recognized the risk of injustice in the immobilization of a defendant from a course of conduct he may have the legal right to pursue; and that this calls for the further rule that the trial court abuses its discretion when the law is misapplied to established facts, or when the evidence does not reasonably support the conclusion that the applicant has a probable right of recovery. *City of Spring Valley v. Southwestern Bell Tel. Co.*, 484 S.W.2d 579 (Tex.1972); *Camp v. Shannon*, 162 Tex. 515, 348 S.W.2d 517 (1961); *Southland Life Ins.*

1. House Bill 819 of the 64th Texas Legislature enacted the Public Utilities Commission Bill, under which Bell, as well as other utilities will be statutorily regulated. The regulatory commission will not, however, assume its duties until January 1, 1976, and its jurisdiction over rates of public utilities is postponed until September 1, 1976.

2. The powers of the Government of the State of Texas shall be divided into three distinct departments, each of which shall be confined to a separate body of magistracy, to wit: Those which are Legislative to one; those which are Executive to another, and those which are Judicial to another; and no person, or collection of persons, being of one of these departments, shall exercise any power properly attached to either of the others, except in the instances herein expressly permitted.

*Co. v. Egan*, 126 Tex. 160, 86 S.W.2d 722 (1935).

This points up Bell's essential position. It asserts that until the Legislature subjects it to intrastate rate regulation, it may charge as it wills for its intrastate telephone service; that the Courts are without jurisdiction to test the reasonableness of its rates at the suit of the State through the Attorney General; that the Attorney General is without lawful power to bring suit attacking the reasonableness of its rates; and that there was no factual support for the temporary injunction in the evidence offered by the State.

 Bell is a privately owned public utility supplying a necessary communication service in which, for all intents and purposes, it enjoys a monopoly. It is a business affected with a public interest. This concept is expressed in *Munn v. Illinois*, 94 U.S. 113, 126, 24 L.Ed. 77 (1876):

Property does become clothed with a public interest when used in a manner to make it of public consequence, and affect the community at large. When, therefore, one devotes his property to a use in which the public has an interest, he, in effect, grants to the public an interest in that use, and must submit to be controlled by the public for the common good, to the extent of the interest he has thus created.

As such, Bell is under the major legal obligations of offering its services without undue discrimination, and at reasonable rates. As to the first, it is settled that the obligation of a utility enjoying a monopoly, whether private or public, to fix non-discriminatory rates is enforceable in the courts. It was said in *City of Texarkana v. Wiggins*, 151 Tex. 100, 246 S.W.2d 622, 624–5 (1952):

The common-law rule that one engaged in rendering a service affected with a public interest or, more strictly, what has come to be known as a utility service, may not discriminate in charges or service as between persons similarly situated is of such longstanding and is so well recognized that it needs no citation of authority to support it. The economic nature of the enterprise which renders this type of service is such that the courts have imposed upon it the duty to treat all alike unless there is some reasonable basis for a differentiation. . . .

The utility consumer is thus at the mercy of the monopoly and, for this reason, utilities, regardless of the character of their ownership, should be and have been, subjected to control under the common-law rule forbidding unreasonable discrimination.

As to the second, it is held that in the absence of rate regulation by some authorized body, state or municipal, the telephone company may prescribe and apply its own rates, subject to the dictates of reasonableness and justice. *Southwestern Bell Tel. Co. v. Houston Ind. Sch. Dist.*, 397 S.W.2d 419 (Tex.1965); *City of Nassau Bay v. Nassau Bay Telephone Co., Inc.*, 517 S.W.2d 613 (Tex.Civ.App.1974, writ ref'd n. r. e.); *General Tel. Co. of Southwest v. Cities Littlefield*, 498 S.W.2d 375 (Tex.Civ.App.1973, writ ref'd n. r. e.); *City of Carrollton v. Southwestern States Tel. Co.*, 381 S.W.2d 401 (Tex.Civ.App.1964, writ ref'd n. r. e.); *City of Houston v. Memorial Bend Utility Co.*, 331 S.W.2d 418 (Tex.Civ.App.1960, writ ref'd n. r. e.). This legal obligation upon the telephone company—that of not exacting exorbitant or unreasonable charges for its services—would be meaningless if there were no judicial redress for its violation. Of course, the fixing or revision of rates is not a judicial function and under our system of separation of powers the courts do not and cannot regulate rates of public utilities; but the determination of whether rates fixed by the utility are unreasonably high is a judicial function. In granting the relief here sought, the Court does not fix a rate or prescribe a future charge; it does no more than determine whether the rate as fixed by Bell is, or is not, lawful. As observed in *Interstate Com. Commission v. Railway Co.*, 167 U.S. 479, 499, 17 S.Ct. 896, 900, 42 L.Ed. 243 (1897):

It is one thing to inquire whether the rates which have been charged and collected are reasonable—that is a judicial act; but an entirely different thing to prescribe rates which shall be charged in the future—that is a legislative act.

The distinction thus drawn is applicable to rates fixed by the utility as well as to those otherwise prescribed. Such fact does not convert the function exercised by the courts from judicial to legislative. See also *Ball v. Texarkana Water Corp.*, 127 S.W. 1068 (Tex.Civ.App.1910, no writ).

The United States Supreme Court has addressed the other side of the coin, i. e., when the utility invokes judicial relief from prescribed rates claimed by the utility to be too low and hence to be violative of due process and equal protection of the law. In *Chicago, Milwaukee and St. Paul Railway Co. v. Minnesota*, 134 U.S. 418, 458, 10 S.Ct. 462, 467, 33 L.Ed. 970 (1890), the utility attacked a statute of Minnesota that, as interpreted by the Supreme Court of the State, provided that rates prescribed by a State commission shall be final and conclusive. The Court held the statute to be in conflict with the Constitution of the United States. In doing so, the majority wrote:

> . . . The question of the reasonableness of a rate of charge for transportation by a railroad company, *involving as it does the element of reasonableness both as regards the company and as regards the public*, is eminently a question for judicial investigation, . . . (Emphasis added).

It is noteworthy that the three dissenting Justices advanced the view that a judicial question as to the reasonableness of rates arises only when there has been legislative inaction.

The Court also wrote in *Reagan v. Farmers' Loan & Trust Company*, 154 U.S. 362, 399, 14 S.Ct. 1047, 1055, 38 L.Ed. 1014 (1894):

> These cases all support the proposition that while it is not the province of the courts to enter upon the merely administrative duty of framing a tariff of rates

for carriage, it is within the scope of judicial power and a part of judicial duty to restrain anything which, in the form of a regulation of rates, operates to deny to the owners of property invested in the business of transportation that equal protection which is the constitutional right of all owners of other property.

See also *C. & L. Turnpike Road v. Sandford*, 164 U.S. 578, 17 S.Ct. 198, 41 L.Ed. 560 (1896) where it was noted that a court determines whether rates are unjust to a utility without assuming itself to prescribe rates.

The courts are no less open to determine whether rates fixed by a utility are reasonable and just for the public. As said in *Smyth v. Ames*, 169 U.S. 466, 547, 18 S.Ct. 418, 434, 42 L.Ed. 819 (1898):

> What the company is entitled to ask is a fair return upon the value of that which it employs for the public convenience. On the other hand, what the public is entitled to demand is that no more be exacted from it for the use of a public highway than the services rendered by it are reasonably worth.

And in *C. & L. Turnpike Road v. Sandford, supra*:

> . . . stockholders are not the only persons whose rights or interest are to be considered. The rights of the public are not to be ignored. It is alleged here that the rates prescribed are unreasonable and unjust to the company and its stockholders. But that involves an inquiry as to what is reasonable and just for the public. . . . The public cannot properly be subjected to unreasonable rates in order simply that stockholders may earn dividends. . . . So that the right of the public to use the defendant's turnpike upon payment of such tolls as in view of the nature and value of the service rendered by the company are reasonable, is an element in the general inquiry whether the rates established by law are unjust and unreasonable.

 We do not agree with the argument of Bell that the court *adjudicates*

when it protects a utility by enjoining a rate as too low; but that the court *legislates* when it protects the public by enjoining a rate as too high. Nor do we subscribe to Bell's contention that under our decisions injunctive relief may be sought in the courts only where the utility seeks redress from a violation of constitutional guarantees and that judicial relief is unavailable to protect the public from rates Bell fixes that are unreasonably high. We hold that the courts have jurisdiction to make this determination, and that in so doing they will not be exercising a legislative function.

It is our further opinion that the Constitution of Texas confers on the Attorney General the authority to institute and maintain suit in the name of the State to restrain Bell from exacting unreasonably high charges for its intrastate telephone services in Texas, if such be the case.

Article IV, Section 22 of the Constitution of Texas provides:

The Attorney General . .. . shall represent the State in all suits and pleas in the Supreme Court of the State in which the State may be a party, and shall especially inquire into the charter rights of all private corporations, and from time to time, in the name of the State, take such action in the courts as may be proper and necessary to prevent any private corporation from exercising any power or demanding or collecting any species of taxes, tolls, freight or wharfage not authorized by law. He shall, whenever sufficient cause exists, seek a judicial forfeiture of such charters, unless otherwise expressly directed by law, and give legal advice in writing to the Governor and other executive officers, when requested by them, and perform such other duties as may be required by law.

█ Bell collects tolls for the use of its intrastate telephone service, see *Southwestern Telegraph & Telephone Co. v. State*, 109 Tex. 337, 207 S.W. 308 (1918); and the law does not authorize Bell to demand or collect from the public unreasonably high charges based on rates that would be extortionate to its subscribers. This Court emphasized in *State v. Farmers' Loan & Trust Co.*, 81 Tex. 530, 17 S.W. 60 (1891), that the Attorney General may institute and maintain suit to prevent the exercise by a corporation of a power not conferred by law when it is made to appear that the exercise of the power by the corporation in question will be hurtful to some interest essentially public. It is self-evident, in our view, that the demand and collection by Bell of unreasonably high—and hence unlawful—charges for the use of its intrastate telephone service by the people of Texas would be an abuse of its corporate power as a public utility, the prevention of which would subserve the public interest. The Attorney General is authorized to take action in the courts to enjoin this being done. Cf. *State v. St. Louis S. W. Ry. Co. of Texas*, 197 S.W. 1006 (Tex.Civ.App.1917), *rev'd on other grounds*, 113 Tex. 570, 261 S.W. 996 (1924); *Western Union Telegraph Co. v. State*, 121 S.W. 194 (Tex.Civ.App.1909) *rev'd on other grounds*, 103 Tex. 306, 126 S.W. 1197 (1910); *Queen Ins. Co. v. State*, 22 S.W. 1048 (Tex.Civ.App. 1893), *rev'd on other grounds*, 86 Tex. 250, 24 S.W. 397 (1893); *State v. Teachers Annuity Life Ins. Co.*, 149 S.W.2d 318 (Tex.Civ. App.1941, writ ref'd); *Day v. State*, 489 S.W.2d 368 (Tex.Civ.App.1972, writ ref'd n. r. e.); *Security State Bank v. State*, 169 S.W.2d 554 (Tex.Civ.App.1943, writ ref'd w. o. m.). The decisions upon which Bell strongly relies—*Garcia v. Laughlin*, 155 Tex. 261, 285 S.W.2d 191 (1955); *State v. Reagan County Purchasing Co.*, 186 S.W.2d 128 (Tex.Civ.App.1944, writ ref'd w. o. m.); and *State v. Harney*, 164 S.W.2d 55 (Tex. Civ.App.1942, writ ref'd w. o. m.) did not involve the problem now before us and are not controlling.

█ Finally, Bell says the evidence offered by the State at the hearing for temporary injunction was grossly insufficient and proved nothing. As noted earlier, the State was not required to show at the temporary injunction stage that it will finally prevail in establishing that the rates fixed

by Bell are unlawful as unreasonably high. Indeed, its task in this regard will be formidable. An exhaustive study of the Bell System by the Federal Communications Commission is reflected in its report, *In the Matter of American Telephone & Telegraph Co. and The Associated Bell System Companies, etc.,* 9 F.C.C.2d 30 (1967). It is there reported that "A.T.&T. [the owner of all the stock of Southwestern Bell Telephone Company] is the world's largest company in assets—$35 billion. It grosses over $12 billion a year, employs about 800,000 men and women, is owned by more than 3 million shareholders of 539 million shares worth about $21 billion, and purchases every year some $1.6 billion in goods and services from more than 45,000 suppliers. This makes it a larger operation than all but very few national governments."

In speaking of the magnitude of the task of regulating the Bell System, the Federal Communications Commission said:

Indeed, lack of resources is an even more serious problem for State and municipal regulatory bodies. And the splintering of jurisdiction between the Federal Government and the States undoubtedly contributes further to the deterioration of effective, coordinated regulation. A.T.&T. is so much bigger, and better financed, than any government agency it confronts that even the process of selecting which information it will offer the regulator gives the whole operation a substantial aura of self-evaluation.

It is recognized that in fixing an intrastate rate there must be a separation or allocation of rate making factors in view of the fact that Bell's major properties are used in common in both interstate and intrastate services. The United States Supreme Court emphasized in *Smith v. Illinois Bell Tel. Co.,* 282 U.S. 133, 51 S.Ct. 65, 75 L.Ed. 255 (1930), that a separation of telephone property, revenues, and expenses between intrastate and interstate operations is essential to rate determination as to each. In speaking of the difficulty of doing so, the Court observed:

* * * While the difficulty in making an exact apportionment of the property is apparent, and extreme nicety is not required, only reasonable measures being essential * * *, it is quite another matter to ignore altogether the actual uses to which the property is put. It is obvious that, unless an apportionment is made, the intrastate service to which the exchange property is allocated will bear an undue burden—to what extent is a matter of controversy. We think that this subject requires further consideration, to the end that by some practical method the different uses of the property may be recognized and the return properly attributable to the intrastate service may be ascertained accordingly.

The record indicates that this essential prerequisite to the fixing of the intrastate rates under attack was not observed by Bell. Illustrative of this are the responses of Bell to certain requests of the State. The following examples recited in the State's Post Submission Brief are not challenged by Bell in its Brief in Reply.

The State requested "documents explaining the separations procedures used by the Company to arrive at the interstate, intrastate, and local rate base." The Company responded that "regulatory separations in Texas identifying interstate and local rate bases employed the principles and procedures contained in the February, 1971 Separations Manual. This Manual is a product of the NARUC–FCC Cooperative Committee on Communications. No separation of rate base to intra-state toll is performed by Southwestern Bell in Texas. A copy of the Separations Manual is provided in response to that request."

The State requested schedules or documents showing the rate of return the Company is seeking on its intra-state toll operations with copies of all internal justification or economic studies supporting this rate of return. The Company responded that "there is no such documentation, since our intention to raise intra-state long distance

rates is not based on required intra-state rate of return, per se."

The State requested "schedules or documents showing the Company's intra-state toll rate based for the last year available at original cost and fair value." The response from the Company was that "this information requested is not available from records kept in the regular course of our business."

 It is fairly inferable from the testimony of representatives of Bell that the amount of the increase—$45,000,000 annually—was arbitrarily developed in the St. Louis office of Bell as the desired amount of additional revenue to be derived from its intrastate operations in Texas, with the rates to be accordingly adjusted; and that the increase was designed to raise the rate of return for the company in all its operations. This increase was sought to be justified on the basis of rising inflation and in order to attract new capital. The expert witness presented by the State testified that his studies indicated that the return from the rate increase on intrastate long distance operations would be in excess of 17 per cent and could go as high as 20 per cent; and that there is a strong probability that the increase is unreasonably high. Without undertaking a detailed recitation, we hold that the evidence of the State was sufficient to invoke the discretionary power of the trial court to temporarily enjoin Bell from placing in effect the rate increase.

We agree with Bell that the temporary injunction order of the trial court is too broad in its terms reading as follows: "It is accordingly ordered that the Defendant, Southwestern Bell Telephone Company, be and it is hereby temporarily restrained pending hearing hereon from increasing the intra-state long distance rates charged to its Texas customers . . . ." We therefore reverse the judgment of the Court of Civil Appeals and modify the judgment of the trial court so as to temporarily enjoin Southwestern Bell Telephone Company from placing in effect the long distance intrastate telephone rate increase an-

nounced to become effective March 1, 1975, pending final trial. The judgment of the trial court as modified is affirmed.

WALKER, J., not sitting.