Olly OTTEN, Individually and d/b/a The Swiss Chalet and The Swiss Chalet Downs, Appellant,

v.

TOWN OF CHINA GROVE, Appellee.

No. 04–83–00269–CV.

Court of Appeals of Texas, San Antonio.

Aug. 31, 1983.

Rehearing Denied Sept. 23, 1983.

Frank Y. Hill, Boerne, for appellant.

Daniel R. Rutherford, Wallace Jacobs, San Antonio, for appellee.

Before CADENA, C.J., and ESQUIVEL and DIAL, JJ.

## OPINION

DIAL, Justice.

This is an appeal from the court's order granting a temporary injunction against the appellant Otten and the Swiss Chalet Downs located in the town of China Grove. China Grove sought the injunction to prohibit the operation of the Swiss Chalet Downs, a horse racing enterprise, located on Otten's private property. After a hearing, the court granted the temporary injunction based on two theories: 1) the violation of an ordinance passed by China Grove prohibiting horse racing within the corporate limits of the town pursuant to TEX.REV.CIV. STAT.ANN. art. 1015 §§ 11 and 28 (Vernon 1963) and 2) that gambling is common at the Otten race track in violation of TEX. REV.CIV.STAT.ANN. arts. 4664 and 4667

(Vernon Supp.1982–83). Appellant Otten raises six points of error of which we sustain two.

By his second point of error, appellant alleges that the trial court erred in holding that the appellant had violated the China Grove ordinance prohibiting horse racing within the corporate town limits pursuant to TEX.REV.CIV.STAT.ANN. art. 1015 § 11 and 28. Appellant argues that this ordinance is not authorized by law and is void. We agree.

The China Grove ordinance No. 83–01–06 reads:

> ... that racing as hereinafter defined shall be prohibited hereafter within the Town of China Grove. Racing shall be defined as the use of any vehicle or animal in any speed, or exhibitions of acceleration. No person shall in any manner participate in any such race, competition or exhibit within the Town of China Grove; [1]

Article 1015 § 11 and 28 read:

The governing body shall also have power:

> \* \* \* \* \* \*
>
> (11) Nuisances—To abate and remove nuisances and to punish the authors thereof by fine, and to define and declare what shall be nuisances and authorized and direct the summary abatement thereof; and to abate all nuisances which may injure or affect the public health or comfort in any manner they may deem expedient.
>
> (28) Unsafe driving—to prevent, prohibit and suppress horse racing, immoderate riding or driving in the streets, ...

■ Article 1015 § 11 allows the city to abate all nuisances. The courts have held that these nuisances must be *per se* nuisances. The rule is that, in the absence of express legislative sanction, a city is without authority to declare a nuisance that which is not so *per se* or at common law. *Crossman v. City of Galveston,* 112 Tex. 303, 247 S.W. 810, 812 (Tex.1923). In discussing § 11 the court in *Sitterle v. Victoria Cold Storage Co.,* 33 S.W.2d 546, 548 (Tex. Civ.App.—San Antonio 1930, writ dism'd) stated that both the Supreme Court and Court of Criminal Appeals have held that this article's grant does not confer upon municipal governments the express power to arbitrarily declare any specific business, calling, project or act to be a nuisance, and prohibit or abate it as such. The municipality has no power to arbitrarily declare and denounce a particular thing or act to be a nuisance, unless it is a nuisance *per se,* or as at common law. A municipal ordinance, passed under a general grant of authority to define and prohibit nuisances, which declares and denounces a nuisance that which is not such *per se* or as to common law, is invalid. The court in *Stoughton v. City of Fort Worth,* 277 S.W.2d 150, 153 (Tex.Civ. App.—Fort Worth 1955, no writ) upheld the city ordinance banning fire works within the city limits but did recognize that a nuisance *per se* is generally defined as an act, occupation, or structure which is a nuisance at all times and under any circumstances, regardless of location or surroundings.

■ Therefore the ordinance passed by China Grove would be valid only if horse racing has been declared to be a nuisance *per se.* Horse racing has never been declared a nuisance by the legislature nor is it illegal. *All Texas Racing Association v. State,* 82 S.W.2d 151, 152 (Tex.Civ.App.— San Antonio 1935), *Aff'd,* 128 Tex. 384, 97 S.W.2d 669 (1936).

■ Article 1015 § 28 concerns the control of horse racing in the streets of a city and is therefore not authority for a city to prohibit horse racing on private property. *See Harris County v. Crooker,* 112 Tex. 450, 248 S.W. 652, 655 (1923). Therefore, we

---

1. This ordinance was amended April 18, 1983 to read:

> ... that racing is prohibited hereafter within the corporate limits of the Town of China Grove. Racing shall be defined as the use or employment of any vehicle, vehicles, animal or animals in any speed competition, speed contest, test of physical endurance, exhibition of speed, exhibition of acceleration, or for the purpose of making a speed record.

hold the China Grove ordinance to be invalid and sustain appellant's second point of error.

Appellant's third point of error alleges that the trial court erred in holding that gambling was conducted at the Swiss Chalet Downs in violation of TEX.REV.CIV. STAT.ANN. art. 4664 and 4667 (Vernon Supp.1982–83). Article 4664 reads:

Nuisance. Any hotel, rooming house . . . or other place to which the public commonly resort . . . or where persons habitually resort for the purpose of prostitution or to gamble as prohibited by the Penal Code, is hereby declared to be a common nuisance. . .

Article 4667 reads:

(a) The *habitual* use, actual, threatened or contemplated, of any premises, place or building or part thereof, for any of the following uses shall constitute a public nuisance and shall be enjoined at the suit of either the State or any citizen thereof:

(1) For gambling, gambling promotion or communicating gambling information prohibited by law; [Emphasis ours]

The Swiss Chalet Downs was open only three Sundays, April 10th, 17th, and 24th. The appellees presented three witnesses that testified to evidence of gambling on two occasions at the racetrack. Ray Westmoreland was hired by the City of China Grove to go undercover and investigate gambling at the Downs. Westmoreland is a Bexar County deputy sheriff but was off duty while at the races. Westmoreland attended the Downs on Sunday, April 10th only. He testified that he observed several instances of gambling. He stated that he saw a person inside the clubhouse make a bet with someone outside the glass door of the clubhouse. The bet was made verbally so that it could be heard by several people. The individual said, "I will take the even numbered horses" and the other person said, "I will take the odd numbered horses and we'll bet $3.00." The individual inside the clubhouse had made separate bets with several other people. At the end of the race he made his rounds and made his pay-offs. Westmoreland stated that the bets

and pay offs he observed were done in the presence of the race track employees, within their hearing and sight, and they did nothing to stop it. He testified that he was at the Downs on only one Sunday.

Wilfredo Ramirez is a reporter for *The News* and attended the horse races on April 10th only. He testified that he saw money exchanging hands at the Downs and believed it to be a result of gambling. Ramirez testified that he saw at least three different groups of people talking about betting and exchanging money. In one group he heard one person ask another, "Well so and so which horse do you like," as the horses were being paraded before the grand stand. Then one of the persons said, "I'll go for No. 2" and the other person said, "I'll go for No. 4." Prior to that he heard them establish the amount of the bet. One said, "Let's start with $20.00 and then we'll see." After the race he saw them passing the $20.00 bill between them. The largest bet he saw was for $20.00. He heard one woman tell her husband to watch out because the T.V. cameras were there and "if you're going to make any bets you better do it under the table." He spoke with the owner Olly Otten about the gambling. Otten told Ramirez that he had not seen any gambling going on, and if there was betting at the track, it was out of his control, and it was probably only friendly betting between friends. Ramirez testified that he did not see any organized gambling, simply people whispering and betting with each other. Ramirez claimed there was not a lot of betting going on but that he had seen three different groups of people betting. He spoke to one of the deputy constables at the track about the betting and he said, "Haven't you ever seen any of this going on at football games." Both Ramirez and Westmoreland were at the track on April 10th only.

James C. Ethridge attended the races on the second Sunday, April 17th. Ethridge testified he observed wagering, gambling and betting and took several pictures that were admitted into evidence. One picture is alleged to be the paying off of a bet he

saw made between two men. He saw the man remove the money from his pocket and give it to the other man. He stated he saw other bets being made beside the one in the picture. He said he saw gambling in the place where mixed drinks were served. Ethridge testified that no effort was made by the employees to stop, hinder or thwart the betting going on in front of them. He contended that betting was occurring on a regular basis in the presence of the employees of the track.

The appellant presented testimony from Sheriff Joe Neaves that neither he nor any of his deputies observed any gambling at the Downs on April 17th. Though officers were present, no one was arrested or charged with the offense of gambling. Appellant argues that there was no evidence presented of habitual gambling. The appellees presented evidence of alleged gambling on only two of the three days the race track was open.

In *Lara v. State,* 153 Tex.Cr.R. 84, 217 S.W.2d 853, 854 (1949) the Court held that evidence of two separate acts of intercourse with another man's wife was insufficient to show habitual intercourse necessary to sustain a conviction of adultery. Proof of occasional acts are not sufficient to show habitual intercourse. In *Cohen v. State,* 189 So.2d 498, 499 (Fla.App.1966), a Florida court held that one instance of taking a bet on a baseball game is insufficient evidence to show a room has "habitually been used" for gambling. Courts have defined habitual to mean constant, customary, accustomed, usual, common, ordinary or done so often and repeatedly as to form a habit. Single or occasional acts do not come within the definition. *People ex rel. Elliot v. Interstate Motor Freight System,* 150 N.E.2d 879, 881, 17 Ill.App.2d 547 (1958); formed or acquired by or resulting from habit; frequent use or custom; formed by repeated impressions. *Hilton v. State,* 53 S.W. 113, 115, 41 Tex.Cr.R. 190 (1899); done by habit, steady, usual, or frequent. *In re Newbern,* 53 Cal.2d 786, 3 Cal.Rptr. 364, 369, 350 P.2d 116, 121 (1960). The evidence presented a few incidents of alleged gambling on only

two Sundays. We hold that this is insufficient evidence of *habitual* use of the Downs for gambling in violation of Article 4667, and to uphold the finding of the trial court that persons habitually resorted to the Downs for the purpose of gambling in violation of Article 4664. Appellant's third point of error is sustained.

The standard of review for a temporary injunction is abuse of discretion. Ordinarily, the trial court has broad discretion in determining whether to issue a temporary injunction, and such judgment will not be overturned unless the record discloses a clear abuse of discretion, but such discretion does not extend to the erroneous application of the law to undisputed facts. *City of Spring Valley v. Southwestern Bell Telephone Co.,* 484 S.W.2d 579, 581 (Tex. 1972); *Integrated Interiors, Inc. v. Snyder,* 565 S.W.2d 350, 352 (Tex.Civ.App.—Fort Worth 1978, writ ref'd n.r.e.); the law does not sanction the issuance of a temporary injunction expected to prevent a threatened injury—an injunction will not lie to prevent an alleged threatened act, the commission of which is speculative and the injury from which is purely conjectural. A temporary injunction will be dissolved if it is based on an erroneous application of the law to the facts. *Dallas General Drivers Warehousemen and Helpers v. Wamix Inc. of Dallas,* 156 Tex. 408, 295 S.W.2d 873, 879 (1956); the risk of injustice in immobilizing a defendant from a course of conduct he may have a legal right to pursue underlies the rule that in issuing a temporary injunction the trial court abuses its discretion when the law is misapplied to established facts or when the evidence does not reasonably support the conclusion that the applicant has a reasonable right of recovery. *State v. Southwestern Bell Telephone Co.,* 526 S.W.2d 526, 528 (Tex.1975).

We therefore hold that the trial court abused its discretion in granting the temporary injunction based on the invalid town ordinance prohibiting horse racing and the insufficient evidence of the habitual use of the premises for gambling purposes.

The judgment of the trial court is reversed and the injunction is dissolved.