**Opinion issued November 7, 2013**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-13-00273-CV

————————————

**SHATISH PATEL, M.D., HEMALATHA VIJAYAN, M.D., SUBODH SONWALKAR, M.D., WOLLEY OLADUT, M.D., Appellants**

**V.**

**ST. LUKE'S SUGAR LAND PARTNERSHIP, L.L.P. AND ST. LUKE'S COMMUNITY DEVELOPMENT CORPORATION-SUGAR LAND, Appellees**

---

**On Appeal from the 152nd District Court**
**Harris County, Texas**
**Trial Court Case No. 2011-24016**

---

## O P I N I O N

Appellants Dr. Shatish Patel, Dr. Hemalatha Vijayan, Dr. Subodh Sonwalkar, and Dr. Wolley Oladut bring this interlocutory appeal from the trial

court's denial of their renewed application for a temporary injunction relating to St. Luke's Sugar Land Hospital. The physicians sought to enjoin St. Luke's Sugar Land Partnership, L.L.P. and its managing partner, St. Luke's Community Development Corporation—Sugar Land (collectively, "St. Luke's") from taking certain actions that would prevent their participation in the management and control of a partnership formed to own and operate the hospital. We reverse the trial court's order denying the application on the grounds of mootness.

## Background

This is the second interlocutory appeal from denials of requests for a temporary injunction in a lawsuit between several physicians and a hospital management partnership. The appellants are physicians who purchased partnership interests in St. Luke's Sugar Land Partnership, L.L.P., which was created to own and operate a hospital in Sugar Land. Ownership of the Partnership was divided into two classes of partnership units: Class A units, which were reserved for physicians, and Class B units, which were reserved for the Partnership's managing partner, St. Luke's Community Development Corporation—Sugar Land, which in turn is a wholly-owned subsidiary of the St. Luke's Episcopal Health System Corporation.

In 2007, the Partnership adopted an Amended Partnership Agreement that established a Governing Board to manage several aspects of the Partnership.

2

Although certain decisions could be made by the holders of an outright majority of the Partnership units, an affirmative vote of board members controlling greater than 50% of the "Voting Interest" was required for all decisions of the Governing Board. The physician representatives on the board who held Class A units were to "collectively control forty-nine (49%) of the Voting Interest." A vote of Governing Board members representing a supermajority of at least 75% of the Voting Interest was required to take several major actions, including making a capital call.

In April 2011, Shatish Patel, a physician partner who had served on the Governing Board, sued the Partnership. Patel alleged that he was promised healthy returns when he purchased his Class A units, but instead the Partnership was operating at a net loss. He further alleged that after an unsuccessful attempt to obtain financial information from the Partnership, he was forced to resign his hospital privileges and also to resign as a member of the Governing Board. He asserted various causes of action including breach of fiduciary duty, fraud, misrepresentation, and theft. A few weeks later, the Partnership made a rescission offer to each physician owner of Class A units. The letter noted that:

> [I]t is possible that the Partnership may (1) adopt a mandatory capital call strategy to address future funding of the Partnership and its operation; and/or (2) dissolve, and transfer the hospital to a wholly owned nonprofit affiliate of [St. Luke's Episcopal Hospital System] due to capital constraints.

3

All but four of the physician owners of Class A units accepted the Partnership's rescission offer. The four who refused the offer are the appellants in this case. After the other physicians' acceptance of the rescission offer, the appellant physicians owned 12 partnership units, and the managing partner owned the rest. The Partnership interpreted the Amended Partnership Agreement to allow the managing partner to control the actions of the Governing Board by virtue of its post-rescission claim to ownership of 95.5% of the partnership units.

On September 2, 2011, the Partnership's Governing Board initiated a capital call without the participation of any board members appointed by the physician partners. Notice of the capital call was sent to Patel, Vijayan, Sonwalkar, and Oladut. The capital call required a contribution of $487,037 each from Patel and Vijayan and $243,518.50 each from Sonwalkar and Oladut, based on the number of units owned by each. The notice of capital call stated that the failure to make the capital contribution by September 30 would amount to a default, allowing the Partnership to terminate the physician's partnership interest. In response, Sonwalkar and Oladut joined Patel and Vijayan in their lawsuit.

The physician partners did not make any contribution in response to the capital call, and the Partnership sent written notice of their purported default. In response, the physicians' attorneys sent the Partnership a letter asserting that the capital call was an ultra vires act under the terms of the Amended Partnership

4

Agreement.  On October 3, 2011, the physicians applied for a temporary injunction.  They sought to enjoin St. Luke's from taking various actions with respect to the Partnership.

In mid-October, the Partnership sent a notice to the physicians, contending that their partnership interests had been terminated, and a request was later sent for the physician partners to assign their interests to the Partnership.  On November 8, 2011, the trial court denied the application for temporary injunction.  The physicians appealed the denial, but they did not request temporary relief to prevent the Partnership from undertaking any further actions pending the interlocutory appeal.  *See* TEX. R. APP. P. 29.3.

After denial of the temporary injunction and while the interlocutory appeal was pending, St. Luke's considered the physicians' interests in the Partnership to have been terminated.  Based on this understanding, the managing partner treated the Partnership as a defunct entity, and beginning in late 2011 it began the process of assuming direct responsibility for operation of the hospital by transferring essential licenses and other paperwork into its own name.

The physician partners ultimately prevailed in their interlocutory appeal of the trial court's denial of their October 2011 application for a temporary injunction. *See Sonwalkar v. St. Luke's Sugar Land P'ship, L.L.P.*, 394 S.W.3d 186 (Tex. App.—Houston [1st Dist.] 2012, no pet.).  This court concluded that as of the time

5

of the denial of their application for temporary injunction, the physician partners were entitled to enjoin actions intended to effect the termination of their partnership interests. Because the capital call was disallowed under the Amended Partnership Agreement, the physicians' partnership interests could not be terminated for failure to pay. Therefore, absent an injunction, they faced the possibility of the irreparable injury of the loss of their management rights. *Id.* at 201–03. Specifically, this court determined that the physician partners collectively controlled 49% of the Partnership's Voting Interest as the remaining Class A unit holders, allowing them to block certain actions of the Governing Board that required a supermajority vote. *Id.* at 201. We remanded for further proceedings in the trial court. *Id.* at 203. St. Luke's did not file a petition for review of our decision.

After our mandate issued, the physicians renewed their October 2011 application for temporary injunction. A temporary injunction hearing was set for December 21, 2012. Two days before the hearing, St. Luke's filed a motion to dismiss the application for temporary injunction on the basis of mootness. Despite having never suggested mootness during the course of the interlocutory appeal, and despite our opinion which explained that the capital call had been ineffective to terminate the physicians' partnership interests, St. Luke's argued to the trial court that the request for a temporary injunction was moot because there had been

6

"Changed Circumstances Since the Filing of the Application." In its written response filed in the trial court, St. Luke's argued as follows:

> Plaintiffs made no attempt to preserve their rights pending appeal. So the Partnership went forward with the previously planned and noticed capital call. The Managing Partner contributed capital in excess of $24,000,000. Plaintiffs did not contribute any additional capital. When notified and provided the opportunity to cure, they failed to do so. Therefore, the Partnership sent Plaintiffs a notice stating that their partnership interests had been terminated. As a result of the termination, only the Managing Partner remained a unit holder. Because there were no longer at least two partners, the Hospital ceased to operate as a partnership. It was owned solely by the Managing Partner, a non-profit entity.
>
> In order to carry out its status as a non-profit corporation and in order to comply with regulatory guidelines applicable to the operation of a non-profit Hospital, the Managing Partner undertook certain actions. Specifically, the Managing Partner:
>
> (i) Withdrew the registration of the Partnership as a limited liability partnership with the Texas Secretary of State;
>
> (ii) Filed an assumed name certificate for St. Luke's to do business as St. Luke's Sugar Land Hospital;
>
> (iii) Filed a final sales tax return for the Partnership with Texas Comptroller;
>
> (iv) Terminated the existing Management Agreement and Purchased Services Agreements;
>
> (v) Transferred its provider number though CMS [Centers for Medicare and Medicaid Services];
>
> (vi) Assigned equipment leases;
>
> (vii) Advised and/or registered St. Luke's as the provider of services with several governmental entities and agencies,

7

including, Texas Medicaid, the Drug Enforcement Agency, the Texas Board of Pharmacy, and the Texas Department of Public Safety (for registration of narcotics and radiation resources); and

(viii) Obtained, as required, new accreditation (or provided notification of changes for accreditation) with numerous agencies or entities, including with Det Norske Veritas, the College of American Pathologists, and the American College of Radiology.

In addition, as a result of the change in ownership of the Hospital, the Managing Partner was required to change its insurance coverage, utilities, supply and vendor contracts, and equipment and services agreements. Finally, the property where the Hospital is located (which was previously leased by the Partnership) was purchased by an affiliated company of the Managing Partner at significant expense.

Notably, St. Luke's did not attach to its written response any evidence to support the factual allegations recited in support of its mootness argument.

The hearing on the renewed application for temporary injunction focused on the suggestion of mootness. St. Luke's presented one witness to support its argument, David Koontz, Senior Vice President of the St. Luke's Health Care System. Koontz had assumed numerous roles with respect to the operations of the Partnership, including serving as "member of the Board, sometimes Interim CEO and for a period the Chair of the Board of the Partnership."

In his testimony, Koontz recounted the history of the Partnership's attempted capital call, including the refusal of the four physician partners to make the capital contribution and the Partnership's subsequent notification to them of the purported

8

termination of their partnership interests. He repeatedly testified that after the purported termination of the remaining physician partners' interests, the managing partner considered the Partnership to have no other remaining partners.

Koontz then proceeded to describe the course of events upon which St. Luke's relied to demonstrate the mootness of the request for a temporary injunction. In his capacity as Senior Vice President, it was Koontz's job to confirm completion of all action necessary for the managing partner to assume the authority to operate St. Luke's Sugar Land Hospital. One such action was to "transfer" a "provider number"[1] through the Centers for Medicare and Medicaid Services (CMS), which was necessary for the managing partner to receive payment from the government for services covered by Medicare and Medicaid, as well as payment from private insurers. Koontz testified that it took "six to nine months" to transfer the provider number for St. Luke's Sugar Land Hospital from the Partnership to the managing partner. He explained that the "main challenge was the unusual nature of the request we were making of CMS" because:

> When they see a transfer of CMS number from one company to another, they are used to some documents accompanying that. Some – you know, some codifying documents. And one of the things that they suggested would be a Bill of Sale. Instead we had to produce

[1] The "provider number" was an apparent reference to the National Provider Identifier, which is used by health care providers and other entities to comply with federal health care regulations and to collect Medicare and Medicaid payments. *See generally* 45 C.F.R. §§ 162.100–162.1902 (2012).

9

other documents. I think those related to the rescission and so on to show that there was only one partner.

Koontz opined that if a court were to order the hospital to transfer the provider number back to the Partnership, there is "no guarantee" that CMS would be able to do that, and to "send it back" now would be "very confusing . . . not only to CMS but a number of others." Another "potential impediment" to transferring the number back to the Partnership, according to Koontz, is an Affordable Care Act provision which prohibits "the ownership of any new physician-owned hospital or the increase in percentage ownership of physicians in general acute care hospitals."

Koontz generally discussed the various licenses held by St. Luke's Sugar Land Hospital. He testified that the overall process of relicensing the hospital had taken "more than a few months," and involved "sending notification of a change of a tax ID associated with the provider number" and "a re-inspection." He also testified that since the managing partner's assumption of responsibility for operating the hospital, it has been operated "as a not-for-profit entity," which in the first year resulted in tax savings of "$2- to $3 million as a combination of property taxes, margin tax and sales tax."

With respect to the Partnership's debts, Koontz testified that the Partnership had approximately $50 million in debt at the time the physicians' interests were purportedly terminated. Of that amount, $12 million was a working capital loan owed to Chase, and $35 million was a seven-year loan also payable to Chase. The

10

balance of the debt was owed to St. Luke's Episcopal Health System. On cross-examination, Koontz conceded that approximately $10 million of the debt was due to the rescission offer. He testified that St. Luke's Episcopal Health System paid off the working capital loan and extinguished its loan to the Partnership, all of which he said would have to be repaid by the Partnership "if it were reformed."

On cross-examination, Koontz also testified that it was his "understanding" that the hospital "is currently owned" by the managing partner. However, he agreed that there was no bill of sale documenting the transfer of hospital assets from the Partnership to the managing partner, and no asset purchase agreement or other document memorializing the transfer of the hospital. Notably, the Partnership's attorney objected to the cross-examination insofar as Koontz was asked about the purported "transfer" of the hospital. The Partnership's counsel argued to the trial court: "I think 'transfer' is misleading and inappropriate. *There is no evidence there was a transfer.* Once you get down to one person—I believe the law is a partnership no longer exists if there is only one partner. So, there is no transfer document necessary." (Emphasis supplied.)

Koontz denied any knowledge of any agreement with the Partnership concerning the payment of its debts by St. Luke's Episcopal Health System. He also denied knowledge of whether the Partnership currently owned any assets. With respect to the current legal status of the Partnership, Koontz testified that his

11

understanding was that it "still needs to exist as a legal entity for the purposes of this litigation."

After the evidentiary hearing, the trial court denied the temporary injunction as moot, explaining in its order: "Since the act sought to be enjoined has already been performed, this court is no longer capable of granting the relief sought." The physicians then filed this interlocutory appeal. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(4) (West Supp. 2012).[2]

## Analysis

"In general, a temporary injunction is an extraordinary remedy and does not issue as a matter of right." *Walling v. Metcalfe*, 863 S.W.2d 56, 57 (Tex. 1993). The purpose of a temporary injunction is to preserve the status quo of the litigation's subject matter pending a trial on the merits. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002). The status quo is "the last, actual, peaceable, non-contested status which preceded the pending controversy." *In re Newton*, 146 S.W.3d 648, 651 (Tex. 2004) (quoting *Janus Films, Inc. v. City of Fort Worth*, 163 Tex. 616, 617, 358 S.W.2d 589, 589 (1962) (per curiam)). To

---

[2] The doctors also filed in this court a separate original proceeding requesting the issuance of a writ of temporary injunction. *In re Patel*, No. 01-13-00330-CV, 2013 WL 3422026 (Tex. App.—Houston [1st Dist.] July 2, 2013, orig. proceeding). We denied the request for equitable relief, noting that "the interlocutory appeal already filed by the relators provides an avenue of relief, including procedures to obtain temporary relief." *Id*. at *1 (citing TEX. R. APP. P. 29.3).

obtain a temporary injunction, the applicant must ordinarily plead and prove three specific elements: (1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim. *Butnaru*, 84 S.W.3d at 204. The applicant is not required to establish that he will prevail on final trial; rather, the only question before the trial court is whether the applicant is entitled to preservation of the status quo pending trial on the merits. *Walling*, 863 S.W.2d at 58.

The decision to grant or deny a temporary injunction lies in the discretion of the trial court, and the court's ruling is subject to reversal only for a clear abuse of that discretion. *Id.* A trial court abuses its discretion in granting or denying a temporary injunction when it misapplies the law to the established facts. *INEOS Grp. Ltd. v. Chevron Phillips Chem. Co.*, 312 S.W.3d 843, 848 (Tex. App.—Houston [1st Dist.] 2009, no pet.) (citing *State v. S.W. Bell Tel. Co.*, 526 S.W.2d 526, 528 (Tex. 1975)). We review the evidence submitted to the trial court in the light most favorable to its ruling, drawing all legitimate inferences from the evidence, and deferring to the trial court's resolution of conflicting evidence. *Id.* (citing *Davis v. Huey*, 571 S.W.2d 859, 862 (Tex. 1978)). Our review is limited to determining whether the trial court abused its discretion in ruling on the application for temporary injunction; we do not reach the merits of the underlying case. *Davis*, 571 S.W.2d at 861–62.

13

The trial court expressly denied the physicians' renewed application for temporary injunction based on the conclusion that it was moot. In the order denying the application for temporary injunction, the trial court stated, "Since the act sought to be enjoined has already been performed, this court is no longer capable of granting the relief sought . . . ."

An issue may be moot if it becomes impossible for the court to grant effective relief. *H&R Block Fin. Advisors, Inc.*, 262 S.W.3d 896, 900 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (citing *Williams v. Lara*, 52 S.W.3d 171, 184 (Tex. 2001)). The appeal of a trial court's denial of a motion for temporary injunction may become moot if the actions sought to be enjoined occur prior to the resolution of the appeal of the denial of the temporary injunction. *See Day v. First City Nat'l Bank of Hous.*, 654 S.W.2d 794, 795 (Tex. App.—Houston [14th Dist.] 1983, no writ). According to St. Luke's, that description applies to the physicians' application for temporary injunction in this case.

After this court issued its opinion in *Sonwalkar v. St. Luke's Sugar Land Partnership, L.L.P.*, 394 S.W.3d 186 (Tex. App.—Houston [1st Dist.] 2012, no pet.), the physicians reurged their prior application for temporary injunction in the trial court. This application for temporary injunction did not request that St. Luke's be required to reverse any acts it had already performed, but only sought to prevent St. Luke's from taking certain future actions pertaining to the governance

14

of the Partnership and disposition of its assets.  To evaluate whether the request for temporary injunctive relief has become moot in light of the evidence presented by St. Luke's, we must consider the precise requests for relief.  Those requests were:

a.      Taking any action to terminate the Partnership Interests or ownership interest of . . . any of the Plaintiffs;

b.      Except pursuant to a vote of the partners where Class A Unit holders have the ability to vote, collectively, 49% of the partnership interest, taking any action identified in Paragraph 8.03(h) of the Amended Partnership Agreement, including actions to:

     i.      Reorganize the Partnership;

     ii.     Take any action in contravention of the Amended Partnership Agreement;

     iii.    Make an assignment for the benefit of creditors of the Partnership or file a voluntary petition under the federal Bankruptcy Code or any state insolvency law;

     iv.     Confess any judgment against the Partnership; or

     v.      Amend or otherwise change the Amended and Restated Partnership Agreement.

c.      Except pursuant to a vote of the Governing Board that includes representatives of Class A Unit holders who are permitted, collectively, to vote 49% of the Voting Interest, taking any action identified in Paragraphs 8.09(a)–(f) of the Amended Partnership Agreement, including actions to:

     i.      Issue new Units, admit new partners, or substitute partners in the Partnership;

     ii.     Borrow money in an amount exceeding $250,000 from any third party for any purpose;

iii. Sell, transfer, assign, dispose of, trade, exchange, quitclaim, surrender, release or abandon any Partnership property or interests therein other than in an amount less than $250,000;

iv. Purchase any real property or make, execute, or deliver any deed or long-term ground lease for any real property;

v. Require or call for any additional capital contributions by the partners or approve the amounts and proportions of such additional capital contributions; or

vi. Impose or approve any fundamental or material change to the general business objectives and purpose of the Partnership.

d. Calling a Meeting of Governing Board without providing notice to the Class A Governing Board representatives elected by Class A Unit holders.

Comparing these requests to the arguments and evidence presented by St. Luke's, no new development has mooted the physicians' application for temporary injunctive relief.

The mootness arguments are essentially predicated on two premises. The first is that the physicians' interests in the Partnership were actually terminated such that the Partnership is now a defunct entity which only survives to defend this pending litigation. The second is that the Partnership's assets, principally the hospital, were conveyed to or otherwise absorbed by the managing partner, so it is too late to preserve the physicians' interest in maintaining those assets. Neither premise survives close scrutiny.

16

With respect to the purported termination of the physicians' partnership interests, our previous opinion already explained that the physicians demonstrated a probable right to injunctive relief to prevent the Partnership from squeezing out the physicians by means of the capital call without approval by 75% of the Voting Interest as required by the Amended Partnership Agreement. *Sonwalkar*, 394 S.W.3d at 202.[3] The managing partner may have acted on the assumption that it was authorized to take the actions it did, but the physicians have demonstrated a probable right to injunctive relief based on the argument that the managing partner's understanding was an incorrect one. Even assuming that the capital call was legitimate, and even assuming the physician partners defaulted by failing to respond to the capital call, the Partnership still failed to effectively terminate the physicians' partnership interests under the Amended Partnership Agreement, which required, among other things, the execution and delivery by the defaulting partners of "any assignments and other instruments that may be reasonable to evidence and fully and effectively transfer the interest of the Defaulting Partner." The Partnership requested assignments from the physician partners, but the physicians refused to provide them. The Partnership took no further action to

---

[3]     The dissenting opinion in this appeal is partially premised on its rejection and re-evaluation of the grounds upon which the prior panel of this court resolved the previous interlocutory appeal.

confirm and enforce its interpretation of the Amended Partnership Agreement so as to terminate the interests of its remaining physician partners.[4]

The mere fact that the Partnership gave the physicians notices of default and termination does not mean that they actually were in default or that their partnership interests were actually terminated. The mere fact that the general partner took various actions and made representations based on a mistaken belief that the Partnership no longer existed and it somehow became the owner of the hospital by operation of law did not make it the owner of the hospital, as suggested by the dissent. The record contains no evidence that the managing partner now owns the hospital, and the dissent points to none. Accordingly, the course of the

---

[4] The dissent does not engage this issue and simply accepts at face value the assertion that the physicians' interests have been terminated. For its part, in response to these arguments, St. Luke's notes that the Amended Partnership Agreement provided that the managing partner, acting "as the Defaulting Partner's irrevocable agent," was authorized to execute "any legal instruments to the appropriate continuing Partners and/or Purchaser." However, St. Luke's does not contend that such documents were actually executed, nor did it produce any evidence that this happened. St. Luke's attempts to explain this by saying that "no assignment was even necessary because the Partnership itself does not hold or exercise individual partnership interests." That response disregards the fact that the assignment of the physicians' partnership interests back to the Partnership would have facilitated the treatment of such interests as having been extinguished, and it also would have served the function of "evidenc[ing] and fully and effectively transfer[ring] the interest of the Defaulting Partner" as contemplated by this provision of the Agreement. In any case, the more fundamental problem for St. Luke's still remains—the phyisicans have demonstrated a probable right to injunctive relief based on the arguments that the capital call was unauthorized, therefore there was no default, and thus there also was no basis to terminate the physician partners.

18

managing partner's conduct was undertaken on the mistaken assumption that the Partnership had been eviscerated, and in assumption of the risk of all consequences which may flow from actions taken in reliance on that mistaken understanding.

With respect to the contention that upon the alleged termination of the physicians' partnership interests, the Partnership had ceased to exist for any purpose other than continuing to defend this litigation, that position is undercut by the physicians' demonstration of a probable right to injunctive relief because their interests were not actually terminated. But even supposing that the general partner had been the only remaining partner, it does not follow that the general partner was effectively the legal heir to all of the Partnership's assets, such that general partner simply could treat Partnership assets as its own. Even if the general partner had determined to wind-up the affairs of the Partnership, *see* TEX. BUS. ORG. CODE §§ 11.051, 11.057 (West 2012), the final disposition of Partnership assets is a part of the winding-up process, *see id.* § 152.706(a), and a prerequisite to the termination of a partnership business, *see id.* § 152.701(1).[5] Moreover, paragraph

---

[5] St. Luke's responds that a wind-up does not require liquidation of assets and sale to third parties, and that the termination of the physician partners' interests resulted in the managing partner being the sole remaining partner in the Partnership. We have explained the flaw in the reasoning that assumes an effective termination of the physician partners, but even if the managing partner had been the sole remaining partner of the Partnership, a proper attempt at winding up the business of the Partnership could have, and prudently would have, included a formal, documented transfer of assets, particularly a valuable asset such as a hospital.

13.02 of the Amended Partnership Agreement expressly provided that "[o]n termination, the assets of the Partnership shall be liquidated and applied to payment of the outstanding Partnership liabilities," and paragraph 13.03 provided that "the Partnership shall not terminate until there has been a winding up of the Partnership's business and affairs, and the assets of the Partnership have been distributed as provided in Section 13.02."

Of course, it still could have been the case that the managing partner, laboring under its misimpression that the physicians had been squeezed out of the Partnership, actually took actions to the effect that ownership of the hospital was actually transferred away from the Partnership. But there is no evidence whatsoever that actually occurred, and again the dissent has pointed to none. The only evidence presented by St. Luke's on this point had to do with administrative aspects of operating a hospital: reassignment of the "CMS provider number"; obtaining new licenses; obtaining a tax advantage by operating the hospital under auspices of a not-for-profit entity; and transferring debt incurred in the name of the Partnership to other entities affiliated with St. Luke's. We cannot infer that any of these actions indicated an actual transfer of hospital ownership from the Partnership to the managing partner, and no evidence to that effect was actually presented to the trial court. The evidence presented actually indicated the opposite, as illustrated by Koontz's description of the obstacles encountered in the effort to

transfer the CMS provider number. In connection with the request for transfer of the provider number, CMS expected to receive some supporting documentation, such as a bill of sale. There was no such document, and the evidence instead showed that in order to accomplish that transfer, the managing partner had to "produce other documents" to persuade CMS that a transfer had occurred by operation of law "related to the rescission" and because the Partnership purportedly had "only one partner." As noted previously, the misunderstanding held by the managing partner about the legal effect of its attempt to terminate the physicians' partnership interests did not have the effect of extinguishing the Partnership or any ownership rights the Partnership has in the hospital.

With the two major premises of the St. Luke's arguments thus discredited, it follows that the mootness arguments simply do not correspond to the actual application for temporary injunction. A request that St. Luke's be required to reverse any of its actions predicated on termination of the physicians' partnership interests presumably would not be a moot request, but that question is not presented because no such relief was requested. The physicians did seek to enjoin "any action to terminate the Partnership Interests or ownership interest of . . . any of the Plaintiffs"—that request is not moot as the Partnership has not been actually extinguished, though St. Luke's evidently persists in a belief otherwise, and in reliance on that misunderstanding continues to take actions respecting the hospital

that are adverse to the physicians' interests. The physicians further sought to enjoin actions requiring their assent under the Amended Partnership Agreement—and given the continued viability of the Partnership, those requests also are not moot. Finally, the physicians sought to enjoin any meeting of the Partnership's Governing Board without notice to their representative—again, not a moot request given the continuation of the Partnership.

The physicians had the burden of proof to establish their entitlement to the injunctive relief they sought. *See, e.g.*, *Walling*, 863 S.W.2d at 58. In our prior decision we concluded this burden had been satisfied. *Sonwalkar*, 394 S.W.3d at 202–03. We conclude that the suggestion of intervening circumstances causing the physicians' application to become moot is unavailing. And we discern nothing else in the record of this interlocutory appeal that would support a conclusion that the requested injunction should not be granted.

## Conclusion

We reverse the order of the trial court, and we remand the cause for further proceedings to set an injunction bond and issue the appellants' requested temporary injunction.

Michael Massengale
Justice

Panel consists of Justices Keyes, Higley, and Massengale.

Justice Keyes, dissenting.