**Opinion issued August 16, 2012**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-11-00473-CV

————————————

**SUBODH SONWALKAR, M.D. AND WOLLEY OLADUT, M. D.,**
**Appellants**

**V.**

**ST. LUKE'S SUGAR LAND PARTNERSHIP, L.L.P. AND ST. LUKE'S**
**COMMUNITY DEVELOPMENT CORPORATION–SUGAR LAND,**
**Appellees**

**On Appeal from the 152nd District Court**
**Harris County, Texas**
**Trial Court Case No. 2011-24016**

## O P I N I O N

Appellants Subodh Sonwalkar, M.D. and Wolley Oladut, M.D. held

partnership units in appellee St. Luke's Sugar Land Partnership, L.L.P ("the

Partnership"). They applied for a temporary injunction to enjoin the Partnership and its managing partner, appellee St. Luke's Community Development Corporation—Sugar Land (the "Managing Partner") from terminating their partnership interests and taking other actions. The trial court denied the application. Sonwalkar and Oladut filed notice of an accelerated appeal. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(4) (West 2008). We reverse the order denying the application and remand the case to the trial court for further proceedings consistent with our opinion.

## Background

The Partnership is a Texas limited liability partnership, which owns and operates St. Luke's Sugar Land Hospital in Sugar Land, Texas. Under the original partnership agreement, the ownership of the Partnership was divided into two classes of partnership units: Class A units, which were reserved for physicians, and Class B units, which were reserved for the Partnership's managing partner. At the Partnership's formation, Class A units were owned by three physicians, and Class B units were owned by SLEHS Holdings, Inc., a Texas corporation. Under the original partnership agreement, Class A units always represented 49% of the "Percentage Interest" of the Partnership and Class B units always represented 51% of the "Percentage Interest," regardless of the number of outstanding Class A units and Class B units. The original partnership agreement defined a partner's

2

"Percentage Interest" as "the percentage of the total Partnership Interest in the Partnership held by a Partner, which percentage shall be calculated by dividing the number of Units held by the Partner by the total number [of] Units issued and outstanding among all Partners at the time, all irrespective of class."

The day after its formation, the Partnership offered Class A units to physicians at the hospital in exchange for $40,000 each. As part of that initial offering, Sonwalkar and Oladut purchased two units each. Shatish Patel and Hemalatha Vijayan, who are co-plaintiffs in the trial court but no longer parties to this appeal, purchased four units each. Other physicians purchased Class A units as part of that first offering as well.

The Partnership made a second offering of Class A units in July 2007. In connection with that second offering, the Partnership adopted the Amended Partnership Agreement. Under the Amended Partnership Agreement, SLEHS Holdings assigned all of its Class B units to the Managing Partner. Paragraph 4.01, concerning the classification of partnership units and the manner for calculating Percentage Interest, was substantially altered, including the elimination of the provision that Class A Units always represented 49% of the Percentage Interest and Class B Units always represented 51% of the Percentage Interest. Instead, any partner's Percentage Interest was calculated by "dividing the number of Units held by the Partner by the total number [of] Units issued and outstanding among all

3

Partners at the time, all irrespective of class." The affirmative vote of partners holding at least 75% of the Partnership Interest was required to approve several types of major actions. For instance, Paragraph 8.03 provided that "neither the individual Partners nor the Governing Board nor the Managing Partner shall have any authority to . . . cause the Partnership to . . . amend or otherwise change this Agreement" without "the consent of Partners holding at least seventy-five percent (75%) of the Partnership Interest." Similarly, Article 11 provided that the partnership agreement could be amended "only by a written instrument executed by Partners holding at least seventy-five (75%) of the Partnership Interest."

An exhibit attached to the Amended Partnership Agreement displayed a table showing the following ownership of partnership units at the time of the agreement's adoption:

| Name of Partner | Current Ownership | |
|---|---|---|
| | % of Partnership Interest | # of Units |
| Managing Partner: | 51% | 147.79592 |
| Class A Partners: | 49% | 142 |

The Amended Partnership Agreement gave the Managing Partner the right to purchase Class B units, including fractional units, when new Class A units were issued, in order "to permit the Unit ownership to remain proportionate among the

two classes of Partners." Thus, when the Partnership issued 54 additional Class A units in connection with the second offering, the Managing Partner acquired 56.20408 Class B units, such that the final ratio of Class B units to Class A units was 204 to 196, thus maintaining the percentage ratio of 51% to 49%.

The Amended Partnership Agreement, like the original partnership agreement, also established a Governing Board to manage several aspects of the Partnership. Paragraph 8.01 provided that the number of Governing Board members was fixed at 15, with 8 reserved for members appointed by the Managing Partner. The remaining members of the Governing Board, called "Physician Representatives," were appointed by partners holding Class A units. The amended agreement also provided that "all decisions of the Governing Board shall be decided by the affirmative vote of Board Members controlling greater than fifty percent (50%) of the voting interest of all Board Members (the 'Voting Interest')." Paragraph 8.09 provided that "Physician Representatives, whether one or more, shall collectively control forty-nine percent (49%) of the Voting Interest." The agreement also specified that several types of major actions of the Partnership, including a capital call, required the affirmative vote of Governing Board members representing 75% of the Voting Interest.

In April 2011, Patel sued the Partnership, alleging that when he purchased his Class A units he was promised healthy returns, but instead the Partnership was

5

operating at a net loss. He further alleged that after an unsuccessful attempt to obtain financial information from the Partnership, he was forced to resign his hospital privileges and also to resign as a member of the Governing Board. He asserted various causes of action including breach of fiduciary duty, fraud, misrepresentation, and theft. Vijayan subsequently joined the suit as Patel's co-plaintiff, and the Managing Partner was joined as the Partnership's co-defendant.

A few weeks after the litigation commenced, the Partnership sent a "Rescission Offer" letter to each owner of Class A units. According to the letter, the Partnership was concerned that other Class A unit holders might assert claims because the disclosures made in connection with offering those units might have been inadequate. Therefore, the letter explained, the Governing Board decided to send the "Rescission Offer" in order to mitigate that risk of litigation. The letter provided each recipient 30 days to elect to rescind his or her purchase of Class A units in exchange for a repayment of the purchase price plus six percent interest from the date of purchase. Upon accepting the "Rescission Offer," a Class A unit holder also agreed to release the Partnership, Managing Partner, and others associated with the Partnership from any and all claims and causes of action. Although almost all of the Class A owners signed and returned acceptances of the Rescission Offer, Patel, Vijayan, Sonwalkar, and Oladut did not.

6

On the same date of the "Rescission Offer" letter, Patel and Vijayan applied for a temporary injunction ("First Temporary Injunction Application"). Patel and Vijayan requested that the Partnership and the Managing Partner be enjoined from the following actions:

A. Taking any further action on the "Rescission Offer";
B. Making any offer to rescind a purchase of Class A units;
C. Making any offer to purchase, redeem, or otherwise acquire Class A units;
D. Taking any action to alter the make-up of the Governing Board; and
E. Taking any action to alter the then current ratio of Class A partners to Class B partners.

The trial court granted Patel and Vijayan's requested relief of a temporary injunction, and it additionally restricted the Partnership and the Managing Partner from:

F. Taking any action that would alter the organization and corporate make-up of the Partnership;
G. Taking any action to initiate a capital call, without further court order; and
H. Taking any action to alter in any manner the Amended Partnership Agreement.

Shortly after the trial court granted this injunctive relief, the Partnership and the Managing Partner filed a motion to modify or vacate the temporary injunction. At a hearing on the motion, the Partnership and the Managing Partner offered, in lieu of the temporary injunction, to place $450,000 into the court's registry out of which any eventual judgment in favor of Patel and Vijayan could be satisfied.

7

Following the hearing, the trial court ordered that the Partnership and the Managing Partner deposit the $450,000 to be held in the court's registry for that purpose, and it dissolved the temporary injunction. The $450,000 deposit was made.

The Partnership continued with the rescission of the issuance of Class A units with respect to those physician owners who had accepted the offer. In an email message sent to current and former Class A unit holders, the Partnership indicated that after the overwhelming acceptance of the rescission offer, the Class A units that were still outstanding represented less than 15% of the Partnership's total Percentage Interest. The same communication announced the adoption of a new amendment to Paragraph 8.01 of the partnership agreement concerning the composition of the Governing Board. Pursuant to the amendment, the Managing Partner retained the right to elect eight members, but the Class A unit holders had the right to elect only one member for each seven percent of the Percentage Interest owned by all Class A unit holders. A subsequent notice was sent to the remaining Class A unit holders to announce a meeting at which they could elect one director to the new Governing Board.

Following this notice, Patel and Vijayan applied for a temporary restraining order and temporary injunction ("Second Temporary Injunction Application"). They argued that despite the completion of the rescission offer, the Class A unit

8

holders still owed 49% of the Partnership. They argued that "[a]bsent preliminary injunctive relief, Plaintiffs will be irreparably harmed by being deprived of their unique right to participate in the management and control of the Partnership." Patel and Vijayan asked the trial court to enjoin the Partnership from calling a meeting of Class A partners to elect less than seven representatives to the Governing Board and from taking other major actions requiring at least 75% of the Percentage Interest or Voting Interest. The trial court denied the application.

Shortly after the Second Temporary Injunction Application was denied, the Partnership sent notice of a capital call to the remaining Class A partners: Patel, Vijayan, Sonwalkar, and Oladut. From Patel and Vijayan, who each owned four units, the Partnership demanded $487,037.00 each, and from Sonwalkar and Oladut, who each owned two units, the Partnership demanded $243,518.50 each. The notice warned that if their capital call payments were not timely received, the Partnership could terminate their respective partnership interests. Attached to the notice was the Managing Partner's "Written Consent in Lieu of Meeting to Action by the Partners." This document stated that the Managing Partner held more than 75% of the Partnership Interest, and it purported to authorize the capital call without the requirement of a Governing Board meeting.

After the notice of capital call was sent, Sonwalkar and Oladut joined the lawsuit as Patel and Vijayan's co-plaintiffs. In addition to filing a joint amended

9

petition, Patel, Vijayan, Sonwalkar, and Oladut filed a joint application for temporary injunction ("Third Temporary Injunction Application") in which they contended that "changed circumstances," specifically the Partnership's capital call, entitled them to injunctive relief. They argued, as the prior applications argued, that the Amended Partnership Agreement provided them with 49% of the Voting Interest of the Partnership. They also argued that the rescission of the other Class A units necessarily reduced the Managing Partner's Class B units from 204 to 12.48980 in order to keep a 51% to 49% ratio with the remaining 12 Class A units. Patel, Vijayan, Sonwalkar, and Oladut maintained that although they would be irreparably harmed by the termination of their partnership interests, they did not have to prove this usual requirement of injunctive relief because their right to a temporary injunction was based on a statute, specifically, Section 152.211 of the Texas Business Organizations Code. *See* TEX. BUS. ORGS. CODE ANN. § 152.211 (West 2011). The Third Temporary Injunction Application requested that the trial court enjoin the Partnership from (1) terminating the plaintiffs' partnership interests; (2) taking actions requiring approval of partners representing 75% of the Partnership Interest, including amending the partnership agreement; and (3) taking actions requiring approval of Governing Board members representing 75% of the Voting Interest, including making a capital call.

10

The trial court held a hearing on the Third Temporary Injunction Application. After the hearing but before the trial court ruled on the application, the Partnership's Governing Board delivered to Patel, Vijayan, Sonwalkar, and Oladut's counsel a notice stating that their partnership interests were terminated for failure to pay the required contribution. In response, Patel, Vijayan, Sonwalkar, and Oladut filed a supplemental brief to apprise the trial court about the termination of their interests and to urge a prompt ruling on their application.

A couple of weeks later, the trial court denied the Third Temporary Injunction Application. Patel, Vijayan, Sonwalkar, and Oladut requested findings of fact and conclusions of law, but the trial court did not act on the request. They then timely filed a joint notice of accelerated appeal from the denial of their Third Temporary Injunction Application. Subsequently, Sonwalkar and Oladut filed an amended notice stating that Patel and Vijayan decided not to pursue the appeal.

**Analysis**

In their first issue on appeal, Sonwalkar and Oladut argue that the trial court erred in denying the Third Temporary Injunction Application because the Amended Partnership Agreement unequivocally entitled the Class A unit holders to 49% of the Voting Interest on the Governing Board, which means that the capital call and the termination of their partnership interests were not authorized. In their second issue, they alternatively argue that the legal effect of the rescission

11

of the other Class A units was to reduce the number of Class B units held by the Managing Partner, because rescissions always restore the parties to their relative positions prior to entering into the transaction.

## I. Legal framework for interlocutory appeal

### a. Standard of review

In general, a temporary injunction is an extraordinary remedy and does not issue as a matter of right. *Walling v. Metcalfe*, 863 S.W.2d 56, 57 (Tex. 1993). The purpose of a temporary injunction is to preserve the status quo of the litigation's subject matter pending a trial on the merits. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002). The status quo is "the last, actual, peaceable, non-contested status which preceded the pending controversy." *In re Newton*, 146 S.W.3d 648, 651 (Tex. 2004) (quoting *Janus Films, Inc. v. City of Fort Worth*, 163 S.W.2d 589, 589 (1962) (per curiam)). To obtain a temporary injunction, the applicant must ordinarily plead and prove three specific elements: (1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim. *Butnaru*, 84 S.W.3d at 204. The applicant is not required to establish that he will prevail on final trial; rather, the only question before the trial court is whether the applicant is entitled to preservation of the status quo pending trial on the merits. *Walling*, 863 S.W.2d at 58.

The decision to grant or deny a temporary injunction lies in the discretion of the trial court, and the court's ruling is subject to reversal only for a clear abuse of that discretion. *Id.* A trial court abuses its discretion in granting or denying a temporary injunction when it misapplies the law to the established facts. *INEOS Grp. Ltd. v. Chevron Phillips Chem. Co.*, 312 S.W.3d 843, 848 (Tex. App.— Houston [1st Dist.] 2009, no pet.) (citing *State v. S.W. Bell Tel. Co.*, 526 S.W.2d 526, 528 (Tex. 1975)). We review the evidence submitted to the trial court in the light most favorable to its ruling, drawing all legitimate inferences from the evidence, and deferring to the trial court's resolution of conflicting evidence. *Id.* (citing *Davis v. Huey*, 571 S.W.2d 589, 862 (Tex. 1978)). Because this is an interlocutory appeal, our review is strictly limited to determining whether there has been a clear abuse of discretion by the trial court's ruling on the application for a temporary injunction, and we do not reach the merits of the underlying case. *Davis*, 571 S.W.2d at 861–62.

### b. Scope of interlocutory review

The Partnership and the Managing Partner contend that Sonwalkar and Oladut's arguments on appeal concern the "ultimate issue" of the underlying case, and therefore this court cannot entertain them. They argue that in order to decide the interlocutory appeal as Sonwalkar and Oladut have presented it, this court will

13

necessarily delve into their causes of action for breach of contract and breach of fiduciary duty.

Sonwalkar and Oladut respond that they have asked this court to review only the denial of the application for a temporary injunction and not any other matter pending in the trial court. They also argue that because we must determine as part of our review whether they have a "probable right to the relief sought," *see Buntaru*, 84 S.W.3d at 204, the merits of the underlying case cannot be ignored altogether. Otherwise, they contend, interlocutory appeals from rulings on temporary injunction applications would be impossible.

We recognize that the scope of our review is strictly limited to determining whether the trial court clearly abused its discretion in denying the Third Temporary Injunction Application. *See Davis*, 571 S.W.2d at 861–62. In conducting our review, we must determine whether Sonwalkar and Oladut were entitled to have the trial court preserve the status quo pending trial on the merits. *See Butnaru*, 84 S.W.3d at 204. Our resolution of this appeal will not determine any of the other matters still pending in the trial court.

### c. Changed circumstances justifying successive applications

The Partnership and Managing Partner contend that the trial court's dissolution of the first temporary injunction barred Sonwalkar and Oladut from reapplying for injunctive relief because the circumstances at the time that the first

temporary injunction was dissolved were identical to those at the time that the Third Temporary Injunction Application was filed. They argue that in order to deter piecemeal applications for injunctive relief, Sonwalkar and Oladut—who are "identically situated" to Patel and Vijayan—cannot raise the matter of the capital call as a "new ground" in the Third Temporary Injunction Application because that ground could have been raised in the first and second applications.

Sonwalkar and Oladut respond that they were not parties to the suit until the Third Temporary Injunction Application was filed and therefore this application was their first and only request seeking injunctive relief. They also point out that they did not file their application until after the Partnership and the Managing Partner sent the capital call notice demanding $243,518.50 from each of them and warning that their partnership units were subject to termination if they failed to pay the demanded contribution. Sonwalkar and Oladut argue that these events represented a change of circumstances that permitted them to apply for a temporary injunction despite the prior applications and the dissolution of the first injunction.

The dissolution of a temporary injunction bars a second application for such injunctive relief, unless the second request is based on changed circumstances not known by the applicant at the time of the first application. *State v. Ruiz Wholesale Co.*, 901 S.W.2d 772, 776 (Tex. App.—Austin 1995, no writ); *see also Smith v.*

15

*O'Neill*, 813 S.W.2d 501, 502 (Tex. 1991) (per curiam) (observing that "decrees of injunction . . . may be reviewed, opened, vacated or modified by the trial court upon a showing of changed conditions"). Changed circumstances are conditions that altered the status quo existing after the temporary injunction was dissolved. *See BS&B Safety Sys., Inc. v. Fritts*, No. 01-98-00957-CV, 1999 WL 447605, at *2 (Tex. App.—Houston [1st Dist.] 1999, no pet.) (mem. op. on rehearing) (not designated for publication). Moreover, "[s]uccessive applications for injunctive relief on grounds that could have been raised in connection with an earlier request for such relief are not allowed where there is insufficient reason why the grounds were not urged in the earlier application." *Ruiz*, 901 S.W.2d at 776. These restrictions on successive requests for injunctive relief sensibly deter piecemeal litigation, conserve judicial resources, and prohibit litigants from receiving "two bites at the apple." *Id.*

The Partnership and the Managing Partner contend that *State v. Ruiz Wholesale Co.*, 901 S.W.2d 772, 776 (Tex. App.—Austin 1995, no writ), supports their position that no change of circumstances has occurred to justify granting a new temporary injunction. In *Ruiz*, a beer distributor sought to enjoin the Texas Alcoholic Beverage Commission from requiring it to have territorial agreements with beer manufacturers before it could resell beer purchased from other distributors. *Ruiz*, 901 S.W.2d at 774. Initially, the trial court issued a temporary

16

injunction to bar the TABC from enforcing the statute purportedly giving the Commission the authority to require such agreements. *Id.* However, on the motion of an intervening distributor, the trial court dissolved the temporary injunction. *Id.*

Subsequently, the TABC issued a letter to all holders of general and local distributors licenses about the dissolution order and advised the distributors "to make sure that you are in compliance with the law." Then, the beer distributor who had applied for the first temporary injunction applied for a second application in which it raised legal grounds that it did not previously raise. *Id.* at 775. The trial court denied the second application, and the beer distributor timely filed an interlocutory appeal. *Id.*

The court of appeals held that the trial court did not abuse its discretion in denying the second application. *Id.* at 777. The court concluded that the legal grounds advanced in the second application were "clearly available" when the first application was made. *Id.* at 776. Moreover, the TABC's notification letter "merely informed beer distributors that the previous injunction had been dissolved and that distributors should comply with" the law. *Id.* "A letter restating this position is not a changed circumstance," the court reasoned, "nor was it unknown at the time of the initial application." *Id.* at 777.

We conclude that *Ruiz* is distinguishable from this case. Even if Sonwalkar and Oladut had been parties to the lawsuit from the outset, it would have been futile for them to have argued in the first and second applications that the possibility of a capital call entitled them to injunctive relief. Although the Partnership might have had at all times the power to make a capital call, that prospect alone would not have entitled Sonwalkar and Oladut to injunctive relief because the "commission of the act to be enjoined must be more than just speculative, and the injury that flows from the act must be more than just conjectural." *Tex. Indus. Gas v. Phoenix Metallurgical Corp.*, 828 S.W.2d 529, 523 (Tex. App.—Houston [1st Dist.] 1992, no writ). There is no evidence in the record that the Partnership had indicated that a capital call was probable or imminent until after the Second Temporary Injunction Application was denied and the Partnership sent its formal notice of capital call. This is the event that "altered the status quo." *See BS&B*, 1999 WL 447605, at *2. Before then, had the trial court granted a temporary injunction on the mere possibility of a capital call, it likely would have abused its discretion. *See Phoenix Metallurgical*, 828 S.W.2d at 523; *see also Dallas Gen. Drivers, Warehousemen & Helpers v. Wamix, Inc., of Dallas*, 295 S.W.2d 873, 416 (Tex. 1956) ("[B]efore an injunction issues there must be evidence that injury is threatened.").

18

We hold that the Partnership's notice of capital call and accompanying warning that Sonwalkar's and Oladut's Class A units were subject to termination for failure to make payment evinced a change of circumstances that permitted Sonwalkar and Oladut to seek injunctive relief, despite the prior applications and the dissolution of the first temporary injunction.

## II. Availability of temporary injunctive relief

### a. Cause of action

To be entitled to temporary injunctive relief, the applicant must plead a cause of action. *See Butnaru*, 84 S.W.3d at 204; *N.W. Bank v. Garrison*, 874 S.W.2d 278, 279 (Tex. App.—Houston [1st Dist.] 1994, no writ). In the absence of special exceptions to the applicant's live pleading made at the time the trial court rules on the temporary injunction application, we construe the pleading liberally in the applicant's favor. *Kennedy v. Gulf Coast Cancer & Diagnostic Ctr. at S.E., Inc.*, 326 S.W.3d 352, 359 (Tex. App.—Houston [1st Dist.] 2010, no pet.).

The sixth amended petition, which was Sonwalkar and Oladut's live pleading at the time the trial court ruled on the Third Temporary Injunction Application, purported to state claims for common law fraud, negligent misrepresentation, breach of fiduciary duty, breach of contract, conversion, civil conspiracy, promissory estoppel, and declaratory relief. The Partnership and Managing Partner did not specially except to this pleading, nor do they dispute on

19

appeal that Sonwalkar and Oladut pleaded a cause of action. Accordingly, for purposes of this interlocutory appeal, Sonwalkar and Oladut have pleaded a cause of action, thereby satisfying the first requirement to be entitled to temporary injunctive relief. *See Butnaru*, 84 S.W.3d at 204.

### b. Irreparable injury

Ordinarily, applicants seeking a temporary injunction must show, in addition to a probable right to relief, that they will be irreparably harmed if the injunctive relief does not issue. *See Butnaru*, 84 S.W.3d at 204. However, Sonwalkar and Oladut argue that because "equitable relief" to enforce partnership rights is specifically authorized by Section 152.211 of the Texas Business Organizations Code, they do not need to show an irreparable injury in order to obtain injunctive relief. *See* TEX. BUS. ORGS. CODE ANN. § 152.211(b) ("A partner may maintain an action against the partnership or another partner for legal or equitable relief, including an accounting of partnership business, to . . . enforce a right under the partnership agreement . . . ."). Sonwalkar and Oladut alternatively argue that even if they are required to show an irreparable injury, they have done so because loss of their management rights is a unique harm that cannot be compensated with monetary damages. They also contend that federal law prohibits physicians like them from making new investments in hospitals, so their Class A units represent their last chance to own part of a hospital in which they practice medicine. *See* 42

20

U.S.C. § 1395nn(a)(1) (generally prohibiting physicians from having a financial relationship with entities to which they make referrals for Medicare patients), § 1395nn(i)(1)(A) (excepting from general rule those hospitals having "physician ownership or investment on December 31, 2010").

The Partnership and the Managing Partner do not dispute the general principle that when a statute specifically provides "injunctive relief" to enforce a right, it dispenses with the common law's irreparable harm requirement. However, they point out that Section 152.211 provides for "equitable relief" without specifying "injunctive relief." They argue that the difference is crucial, and the general authorization of "equitable relief" does not eliminate the common-law requirement of showing irreparable harm will result in the absence of injunctive relief. The Partnership and the Managing Partner argue that Sonwalkar and Oladut cannot meet this requirement because, if they are entitled to relief, they have an adequate legal remedy in the form of money damages to compensate them for the loss of their Class A units.

At common law, the applicant seeking an injunctive relief must plead and prove a probable, imminent, and irreparable injury for which no adequate remedy at law exists. *See Butnaru*, 84 S.W.3d at 204; *Butler v. Arrow Mirror & Glass, Inc.*, 51 S.W.3d 787, 795 (Tex. App.—Houston [1st Dist.] 2001, no pet.). "However, if an applicant relies on a statute that defines the requirements for

21

injunctive relief, then the express statutory language supersedes common law requirements." *Butler*, 51 S.W.3d at 795; *see also* TEX. CIV. PRAC. & REM. CODE ANN. § 65.001 (West 2008) ("The principles governing courts of equity govern injunction proceedings if not in conflict with this chapter or other law."); TEX. R. CIV. P. 693 ("The principles, practice and procedure governing courts of equity shall govern proceedings in injunctions when the same are not in conflict with these rules or the provisions of the statutes.").

In *Town of Palm Valley v. Johnson*, 87 S.W.3d 110 (Tex. 2001) (per curiam), the Supreme Court of Texas considered whether the general statutory provision of the Civil Practice and Remedies Code authorizing injunctive relief abrogated the common law's irreparable injury requirement. The statute at issue provided:

> A writ of injunction may be granted if . . . the applicant is entitled to the relief demanded and all or part of the relief requires the restraint of some act prejudicial to the applicant . . . .

TEX. CIV. PRAC. & REM. CODE ANN. § 65.011(1). The Supreme Court concluded that the Legislature had not intended by this statute to replace the equitable remedy of an injunction with a statutory one. *Johnson*, 87 S.W.3d at 111. Therefore, "it follows that the statute did not abolish the requirement of a showing of irreparable injury." *Id.*

22

Appellate courts have held that various other statutes providing for injunctive relief do dispense with the common law's irreparable injury requirement. *See, e.g.*, *State v. Tex. Pet Foods,* 591 S.W.2d 800, 805 (Tex. 1979) (holding that "doctrine of balancing the equities has no application to this statutorily authorized injunctive relief" and affirming injunctions authorized by Texas Clean Air Act, Texas Water Quality Act, and Texas Renderers' Licensing Act); *Butler*, 51 S.W.3d at 795 (holding that Covenants Not to Compete Act, which provides that court may award injunctive relief if promisor breaches non-compete covenant, does not require promisee to show irreparable injury); *City of Houston v. Proler*, No. 14-10-00971-CV, 2012 WL 1951071, at *11 (Tex. App.—Houston [14th Dist.] May 31, 2012, no pet. h.) (holding that Texas Commission on Human Rights Act, providing injunctive relief to prohibit employer from engaging in unlawful employment practice, dispenses with irreparable injury requirement); *Cook v. Tom Brown Ministries*, No. 08-11-00367-CV, 2012 WL 525451, at *5 (Tex. App.—El Paso Feb. 17, 2012, pet. filed) (holding that Election Code, providing injunctive relief to person who is harmed or in danger of being harmed by violation of the Code, supersedes common law irreparable injury requirement); *Marauder Corp. v. Beall*, 301 S.W.3d 817, 820 (Tex. App.—Dallas 2009, no pet.) (holding that injunctive relief pursuant to Texas Debt Collection Act does not require proof of irreparable injury); *West v. State*, 212 S.W.3d 513, 519 (Tex.

23

App.—Austin 2006, no pet.) (implicitly holding that Deceptive Trade Practices Act supersedes common law injunctive requirements such that State need only show that respondent may be violating the Act and that the action was in the public interest); *Gulf Holding Corp. v. Brazoria Cnty.*, 497 S.W.2d 614, 619 (Tex. Civ. App.—Houston [14th Dist.] 1973, writ ref'd n.r.e.) (holding that "doctrine of balancing of equities does not apply" to Open Beaches Act which provides for mandatory injunction).

Like other circumstances in which the irreparable injury requirement has been abrogated by statute, Sonwalkar and Oladut argue that Section 152.211(b) of the Business Organizations Code supersedes the common law in this regard. That statute provides:

> A partner may maintain an action against the partnership or another partner for legal or equitable relief, including an accounting of partnership business, to:
>
> (1) enforce a right under the partnership agreement;
>
> (2) enforce a right under this chapter . . . ;
>
> (3) enforce the rights and otherwise protect the interests of the partner, including rights and interests arising independently of the partnership relationship; or
>
> (4) enforce a right under Chapter 11 [concerning winding up and termination of domestic entities].

TEX. BUS. ORGS. CODE ANN. § 152.211(b). Although this statute generally authorizes actions for "equitable relief," we do not find in this provision any

24

"express statutory language" that "defines the requirements for injunctive relief." *Butler*, 51 S.W.3d at 795. In other cases in which appellate courts have held that a statute supersedes the common law's injunctive irreparable injury requirements, the statute has specifically defined the type of injury that must be shown to entitle the applicant to injunctive relief. *See, e.g.*, TEX. BUS. & COM. CODE ANN. § 15.51(a) (West 2011) (Covenants Not to Compete Act—breach by the promisor of the covenant); TEX. LAB. CODE ANN. § 21.258 (West 2006) (Texas Commission on Human Rights Act—respondent is engaging in unlawful employment practice); TEX. ELEC. CODE ANN. § 273.081 (West 2010) (Election Code—person is being harmed or is in danger of being harmed by a violation or threatened violation of the statute); TEX. BUS. & COM. CODE ANN. § 17.47(a) (West 2011) (Deceptive Trade Practices Act—consumer protection division has reason to believe person is engaging in, has engaged in, or is about to engage in any act or practice declared to be unlawful by Act); TEX. NAT. RES. CODE ANN. § 61.018(a) (West 2011) (Open Beaches Act—injunction to remove or prevent any improvement, maintenance, obstruction, barrier, or other encroachment on a public beach, or to prohibit any unlawful restraint on the public's right of access to and use of a public beach or other activity that violates the Act). Thus, in such cases, the statute's express language defining the requisite injury to be demonstrated supersedes the common law's irreparable injury requirement.

25

However, Section 152.211(b) of the Business Organizations Code, although generally authorizing injunctions to "enforce a right under the partnership agreement" and the like, does not define the requisite injury entitling the applicant to injunctive relief. We conclude that this provision is more comparable to Section 65.011(1) of the Civil Practice and Remedies Code, which the Supreme Court held in *Town of Palm Valley v. Johnson* does not supersede the irreparable injury requirement despite its general authorization of injunctive relief to restrain "some act prejudicial to the applicant." TEX. CIV. PRAC. & REM. CODE ANN. § 65.011(1). Accordingly, Section 152.211(b) does not supersede the common law's irreparable injury requirement, and Sonwalkar and Oladut were required to meet this requirement in order to be entitled to injunctive relief.

"An injury is irreparable if the injured party cannot be adequately compensated in damages or if the damages cannot be measured by any certain pecuniary standard." *Butnaru*, 84 S.W.3d at 204. "Generally, money damages may be inadequate to compensate an injured party for the loss of property deemed to be legally 'unique' or irreplaceable." *N. Cypress Med. Ctr. Operating Co. v. St. Laurent*, 296 S.W.3d 171, 175 (Tex. App.—Houston [14th Dist.] 2009, no pet.). Thus, a trial court may grant injunctive relief when a dispute involves real property. *Butnaru*, 84 S.W.3d at 211; *see, e.g.*, *Lavigne v. Holder*, 186 S.W.3d 625, 629 (Tex. App.—Fort Worth 2006, no pet.); *Greater Houston Bank v. Conte*,

26

641 S.W.2d 407, 410 (Tex. App.—Houston [14th Dist.] 1982, no writ). Moreover, a trial court may grant injunctive relief when the enjoined conduct threatens to disrupt an ongoing business. *See, e.g.*, *David v. Bache Halsey Stuart Shields, Inc.*, 630 S.W.2d 754, 757 (Tex. App.—Houston [1st Dist.] 1982, no writ); *IAC, Ltd. v. Bell Helicopter Textron, Inc.*, 160 S.W.3d 191, 200 (Tex. App.—Fort Worth 2005, no pet.); *Liberty Mut. Ins. Co. v. Mustang Tractor & Equip. Co.*, 812 S.W.2d 663, 666–67 (Tex. App.—Houston [14th Dist.] 1991, no writ).

The alleged irreparable injury in this case is the termination of interests in a limited liability partnership. That circumstance alone does not demonstrate that a remedy on appeal would be inadequate per se. For example, in *North Cypress Medical Center Operating Co. v. St. Laurent*, 296 S.W.3d 171 (Tex. App.—Houston [14th Dist.] 2009, no pet.), a medical doctor, St. Laurent, owned limited partnership shares in a limited partnership that owned and maintained a hospital. *N. Cypress*, 296 S.W.3d at 174. Although St. Laurent shared in the partnership's net income and distributions, he had no right to manage or control the partnership's operation, business, or activities. *Id.* After the partnership notified him that it intended to sell his shares because of his purported breach of the limited partnership agreement, he applied for and obtained a temporary injunction to prevent the involuntary sale. *Id.* When the partnership appealed, St. Laurent argued that the sale of his shares would constitute an irreparable injury because

27

they are unique and irreplaceable. *Id.* at 176. The court of appeals disagreed, concluding that St. Laurent had "not shown that money damages cannot take [the shares'] place" since his "ownership interest gives him no voice in the control or management of the partnership." *Id.* It further reasoned:

> The undisputed evidence in the record indicates that St. Laurent is at risk for loss of only his proportionate share in the partnership's net income and any future distributions. Both of these items represent an interest in *money*. Therefore, St. Laurent has not shown that breach-of-contract damages would be inadequate to compensate him for any such monetary losses.

*Id.* The court of appeals held that St. Laurent had not shown an irreparable injury and it reversed and dissolved the temporary injunction. *Id.* at 180; *see also Doerwald v. MBank Fort Worth, N.A.*, 740 S.W.2d 86, 90 (Tex. App.—Fort Worth 1987, no writ) (holding that party to joint venture agreement with 5% interest in profits failed to prove irreparable injury because his remedy was action for lost profits measurable by pecuniary loss standard).

Under different circumstnaces, however, an appeal was found to offer an inadequate remedy in *Health Discover Corp. v. Williams*, 148 S.W.3d 167 (Tex. App.—Waco 2004, no pet.). In *Williams*, a corporation sued several of its officers and directors who had allegedly acquired shares in the corporation without complying with the statutory requirements pertaining to such transactions. *Williams*, 148 S.W.3d at 168–69. The corporation sought principally the cancelation of the issued shares. *Id.* at 168. The trial court denied the

28

corporation's application for temporary injunction, which would have prohibited the officers and directors from selling their shares during the pendency of the litigation. *Id.* The court of appeals reversed and directed the trial court to issue a temporary injunction commanding the officers and directors to refrain from selling or otherwise transferring the shares and to deposit the shares at issue into the court's registry. *Id.* at 170–71. The court noted that money damages would be an inadequate remedy because the corporation had no assurance that it could repurchase the shares in question once they were sold. *Id.* at 170. The court also noted that the relative voting rights of all shareholders were affected unless the shares were canceled. *Id.*

Turning to the circumstances presented in this appeal, the Third Temporary Injunction Application alleged that the Partnership was, among other things, "denying the Class A Governing Board representatives their right to 49% of the Voting Interest on the Governing Board" and that it had "indicated in its Notice of Capital Call that it will seek to terminate Plaintiffs' partnership interest unless Plaintiffs fork over almost $1.5 million." It further alleged that "[a]s Class A Unit holders, Plaintiffs will imminently lose the ability to prevent the Partnership and the managing partner from taking fundamental actions, including amendments to the Amended Partnership Agreement." A verified copy of the Partnership's notice of capital call was attached to the application, reflecting a demand for capital

contributions and warning that partnership interests were subject to termination if the contributions were not paid. The application asserted that "rights to participate in management and control of a partnership are unique, and no adequate remedy at law exists for depriving Plaintiffs of that right" and, therefore, "[t]he Court should grant Plaintiffs' Application for Temporary Injunction because money cannot buy the right to deprive a partner of management and control rights in a partnership."

We conclude based on the circumstances of this case that Sonwalkar and Oladut have pleaded and proved that they would be irreparably injured if the temporary injunction did not issue. With the termination of their partnership interests, they lose several management rights, including the right to participate with other Class A unit holders in selecting a Governing Board representative who wields 49% of the Voting Interest and can block several major actions, such as capital calls. These non-pecuniary management rights distinguish this case from *North Cypress* and *Doerwald*, in which the applicants for injunctive relief had only rights to share in profits, which could be restored to them as a money judgment at the end of the ordinary appeal process. Because the management rights at issue in this case "cannot be measured by any certain pecuniary standard," *Butnaru*, 84 S.W.3d at 204, and are unique and irreplaceable, *N. Cypress*, 296 S.W.3d at 175, money damages would not provide adequate compensation. Accordingly, Sonwalkar and Oladut have demonstrated an irreparable injury.

30

### c. Probable right to relief

Turning to the final element necessary to obtain a temporary injunction, Sonwalkar and Oladut argue that they demonstrated a probable right to the injunctive relief sought because the Amended Partnership Agreement provides that Class A unit owners control 49% of the Voting Interest on the Governing Board, and therefore the Governing Board lacked the authority to make the capital call. They rely on the language of Paragraph 8.09 of the Amended Partnership Agreement, which provides that the "Physician Representatives [on the Governing Board], whether one or more, shall collectively control forty-nine percent (49%) of the Voting Interest, which shall be allocated among the Physician Representatives in attendance at the meeting (whether in person or by proxy) on a per capita basis." Sonwalkar and Oladut also argue that the legal effect of any rescission is to restore the parties to the position before the contract was made. Thus, they contend that the effect of the rescission of the other Class A Units was to reduce the number of Class B Units owned by the Managing Partner to 12.48980 such units. If this were so, the percentage ratio of all outstanding Class B Units to all outstanding Class A Units would be 51% to 49%—the same ratio as before the consummation of the rescission offers—rather than the approximate percentage ratio of 94% to 6% that the Managing Partner and the Partnership maintain is accurate.

The Partnership and the Managing Partner argue that the amendment to Section 8.01 of the Amended Partnership Agreement, which effectively reduced the number of Class A representative members on the Governing Board from seven to one, also reduced the Voting Interest of the Governing Board's Class A representative members. According to the Partnership and the Managing Partner, "It does not make sense that despite the drastic reduction in the Percentage Interest of the Class A partners in 2011, the four remaining members would still retain the entirety of their former partners' 49% vote on the Governing Board."

Partnership agreements are construed and interpreted pursuant to the applicable law of contracts. *Park Cities Corp. v. Byrd*, 534 S.W.2d 668, 672 Tex. 1976); *Murphy v. Seabarge, Ltd.*, 868 S.W.2d 929, 933 (Tex. App.—Houston [14th Dist.] 1994, writ denied). "In construing a written contract, the primary concern of the court is to ascertain the true intentions of the parties as expressed in the instrument." *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 662 (Tex. 2005). "To achieve this objective, we must examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless." *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003). "No single provision taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument." *Id.* "Contract terms are given their plain,

32

ordinary, and generally accepted meanings unless the contract itself shows them to be used in a technical or different sense." *Valence Operating*, 164 S.W.3d at 662. We may neither rewrite the parties' agreement nor add to its language. *Am. Mfgs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 162 (Tex. 2003).

Under this partnership agreement, "Percentage Interest" and "Voting Interest" are not synonymous terms. Paragraph 8.09 provides that the "Physician Representatives [on the Governing Board], whether one or more, shall collectively control forty-nine percent (49%) of the Voting Interest, which shall be allocated among the Physician Representatives in attendance at the meeting (whether in person or by proxy) on a per capita basis." The amendment to Paragraph 8.01 effectively reduced the number of Physician Representatives on the Governing Board to one. Despite this, under the plain and unamended terms of Paragraph 8.09, the one Class A Unit representative on the Governing Board controls 49% of the Voting Interest. Paragraph 8.09 further provides that the affirmative vote of Board Members controlling at least 75% of the Voting Interest is required for a capital call. Because it is undisputed that no Physician Representative on the Governing Board approved the capital call at issue, the capital call necessarily was not approved by 75% of the Voting Interest as required by the Amended Partnership Agreement.

Pursuant to the partnership agreement as currently amended, we hold that Sonwalkar and Oladut have demonstrated a probable right to injunctive relief to prevent the Partnership and the Managing Partner from taking actions requiring 75% of the Voting Interest, including the making of a capital call.

**Conclusion**

In summary, we have determined that a change of circumstances permitted Sonwalkar and Oladut to seek injunctive relief despite the fact that two prior applications for injunctive relief had been filed by other similarly situated plaintiffs before they joined the suit.

On the merits of the request for temporary injunctive relief it is undisputed that Sonwalkar and Oladut pleaded a cause of action. Because their valuable management rights under the Amended Partnership Agreement would be terminated absent injunctive relief, and because such rights cannot be compensated by any certain pecuniary standard, they proved an irreparable injury. We also determined a probable right to relief because the capital call was disallowed under the Amended Partnership Agreement due to the lack of approval by the 75% supermajority of the total Voting Interest required for such action. Because the capital call was disallowed, Sonwalkar's and Oladut's interests could not be terminated for failure to pay the capital call.

We conclude that Sonwalkar and Oladut pleaded and proved that under the current version of the Amended Partnership Agreement they had a right to a temporary injunction to enjoin the termination of their partnership interests, and we further conclude that the trial court erred by denying that relief. We do not reach Sonwalkar and Oladut's second issue on appeal, regarding whether the legal effect of the rescission of Class A units was to reduce the number of Class B units, as it is not necessary to the disposition of this appeal. *See* TEX. R. APP. P. 47.1.

We reverse the trial court's order denying the Third Temporary Injunction Application and remand the case for further proceedings consistent with this opinion.

Michael Massengale
Justice

Panel consists of Justices Bland, Massengale, and Brown.