**Opinion issued July 23, 2019**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-18-00366-CV

————————————

**PANKAJ SHAH, M.D., AND KRISHNA FINANCIAL, LTD., Appellants**

**V.**

**KEITH REMELS AND DOW, GOLUB, REMELS & GILBREATH, PLLC, Appellees**

---

**On Appeal from the 152nd District Court
Harris County, Texas
Trial Court Case No. 2011-24016-A**

---

## MEMORANDUM OPINION

Appellant Pankaj Shah, M.D., and his entity, appellant Krishna Financial,

Ltd. (collectively, "Shah"), sued appellees Keith Remels and Dow, Golub, Remels

& Gilbreath, PLLC,[1] alleging fraud, professional negligence, and numerous other causes of action. Shah alleged that Remels, while acting as his attorney, induced him to rescind his purchase of ownership units in a hospital partnership under an unreasonably abbreviated deadline and on terms that artificially undervalued the units.

Remels successfully moved for summary judgment on the affirmative defense of limitations, seeking dismissal of all of Shah's claims and contending that they are actually professional-negligence causes of action and that a June 2011 email chain among the interested parties conclusively establishes that limitations on Shah's claims began to run on June 17, 2011. Shah, on the other hand, alleged that the discovery rule applies to modify the usual operation of the statute of limitations and Remels bore the burden of conclusively negating the application of the discovery rule. Shah argued that the email chain—in which Shah and Remels, among others, discussed details of the rescission of the ownership units in the partnership—did not conclusively establish that Shah knew or through the exercise of reasonable care and diligence should have discovered, the nature of his injury and the likelihood that his injury was caused by Remels's wrongful acts. *See Pirtle*

---

[1]     Although the law firm Dow, Golub, Remels & Gilbreath PPLC was a party to the trial court's summary judgment order that is the subject of this appeal, Shah represents in his brief that "he does not challenge the Trial Court's granting of summary judgment on Shah's claims against [the law firm]. This brief will address only Remels's limitations grounds." Accordingly, we do not review the summary judgment as it relates to the law firm.

*v. Kahn*, 177 S.W.3d 567, 571 (Tex. App.—Houston [1st Dist.] 2005, pet. denied). Specifically, Shah asserts that nothing in the email chain referenced the rescission offer's valuation assumptions for the units or any of the circumstances that Shah alleges later showed the units to be significantly more valuable than the rescission offer represented.

In his sole issue on appeal, Shah contends that the trial court erred in granting Remels's motion for summary judgment based on his limitations affirmative defense because Remels did not carry his burden to negate the discovery rule. Because we conclude that the email chain's contents failed to conclusively establish that Shah knew or "through the exercise of reasonable care and diligence should have discovered, the nature of his injury and the likelihood that it was caused by the wrongful acts of" Remels by the last date of the email chain in June 2011, we hold that the trial court erred in granting summary judgment in Remels's favor. We therefore reverse the part of the trial court's summary judgment dismissing all of Shah's claims against Remels on limitations grounds and remand the case for further proceedings consistent with this opinion.

## Background

The partnership arrangement underlying Shah's claims against Remels was involved in this court's two prior opinions of *Patel v. St. Luke's Sugar Land Partnership, L.L.P.*, 445 S.W.3d 413 (Tex. App.—Houston [1st Dist.] 2013, pet.

denied), and *Sonwalkar v. St. Luke's Sugar Land Partnership, L.L.P.*, 394 S.W.3d 186 (Tex. App.—Houston [1st Dist.] 2012, no pet.).

**I.      The Partnership and the offer to rescind Class A Partnership units**

Shah was a physician-partner in "St. Luke's Sugar Land Partnership, L.L.P., which was created to own and operate a hospital in Sugar Land." *See Patel*, 445 S.W.3d at 414; *accord Sonwalkar*, 394 S.W.3d at 189. Ownership in the Partnership was divided into two classes of partnership units. Class A units were reserved for physicians, and Class B units were reserved for the Partnership's managing partner, St. Luke's Community Development Corporation—Sugar Land, which is a wholly owned subsidiary of the St. Luke's Episcopal Health System Corporation. *Patel*, 445 S.W.3d at 414–15; *Sonwalkar*, 394 S.W.3d at 189.

Many of the Partnership's operations and activities were to be governed by a Governing Board. *Patel*, 445 S.W.3d at 415. Although certain decisions could be made for the Partnership by the holders of an outright majority of Partnership units, an affirmative vote of Board members controlling greater than 50% of the "Voting Interest" was required for all Board decisions. *Patel*, 445 S.W.3d at 415; *Sonwalkar*, 394 S.W.3d at 190–91. Beyond that, certain major actions, including making capital calls, could be taken only by an affirmative vote of 75% of the Voting Interest. *Patel*, 445 S.W.3d at 415; *Sonwalkar*, 394 S.W.3d at 191. The

4

Class A physician Board members were to "collectively control forty-nine (49%) of the Voting Interest." *Patel*, 445 S.W.3d at 415; *Sonwalkar*, 394 S.W.3d at 191.

In April 2011, Dr. Patel, another physician-partner and Class A unit-holder, sued the Partnership. He alleged that he was not receiving the "healthy returns" that he had been promised when he bought his units. *Patel*, 445 S.W.3d at 415; *Sonwalkar*, 394 S.W.3d at 191. Shortly after that lawsuit began, the Partnership sent a "Rescission Offer" to all Class A unit-holders, purportedly to mitigate the risk that they might, like Patel, bring claims against the Partnership. *Sonwalkar*, 394 S.W.3d at 191. The letter accompanying the rescission offer provided each recipient thirty days to choose whether to rescind his or her purchase of Class A units. *Id.* A rescinding unit-holder would be paid his or her original purchase price plus six percent interest from the date of purchase. *Id.* But, Shah asserts, Remels and the Partnership represented that if a unit-holder did not agree to rescind, then the remaining Class B-related Voting Interest on the Board would have the power to make capital calls irrespective of any dissenting vote by non-rescinding Class A Board members. This could lead to a forced dilution of the Class A voting power, which would even further solidify the Class A Board members' inability to resist Class B unilateral control. *See Patel*, 445 S.W.3d at 415; *Sonwalkar*, 394 S.W.3d at 191.

## II.     The June 2011 email chain between Remels, Shah, and others

Remels was an attorney for the Partnership, and he emailed the rescission offer to Shah on June 10, 2011, starting the email chain that is central to this appeal. On June 16, Shah responded to Remels and included other Board members and St. Luke's representatives on the email. Shah told them that, earlier that day, the Securities Group had contacted him. The Securities Group had helped the Partnership initially sell Class A units to physicians. The Securities Group told Shah that he had until the next day, June 17, and not actually thirty days from June 10, to accept the rescission offer, because Texas securities law imposes a five-year statute of repose on a securities purchaser's ability to rescind the purchase. In his email, Shah asked Remels to "clarify" when the actual deadline to accept the rescission offer was and asked for his answer "ASAP."

Remels then called Shah, and they talked. Remels summarized their call in a reply in the email chain, stating: "I advised you that I am not your attorney and that you should seek independent counsel regarding your rights under the offer of rescission" and "any consequence for delaying" in accepting the offer.

Shah emailed back. He reasserted his understanding that Remels was also Shah's attorney, called Remels "the Class A partner legal representative," and demanded from him "a more clear and defined answer than what you have given me so far, because I am a Class A partner." Shah explained that he was confused

6

about the deadline for accepting the rescission offer, referring to Remels's June 10 email transmitting the offer as "say[ing] in black and white that we have 30 days, till July 11, 2011 to accept. I intended to use the full amount of time so I may have a proper attorney review of the rescis[s]ion offer. I believe you are familiar with my attorneys."

Remels emailed a reply, reiterating that he did not represent Shah and represented the Partnership only. Shah then emailed in reply:

> Your threats about "consequences," your refusal to give the proper specific date, your refusal to shed any light on the 5[-]year securities statute of limitations, and your misrepresentation about our agreement to give a release to the partners[] speaks volumes about who you represent, and your failure to fulfill your responsibility to the partnership, which includes me.

A representative of St. Luke's, also on the email chain, then emailed with his view that Remels did not represent Shah and that Shah should seek his own attorney regarding the rescission offer.

Shah emailed again in reply and referred once more to the rescission offer's thirty-day period "so I may have a proper and thorough attorney review of the rescission offer. Mr. Remels is very familiar with my attorneys from their prior dealings, and perhaps that is why he has pulled this bait and switch."

Shah summed up his position in the email chain:

> Based on your actions and threats, I have no choice but to accept the rescission under duress, but am noting the following for the record:

1 - I am accepting this rescission as a result of your non-responsiveness and threats[.]

2 - I do not believe that Mr. Remels who is also supposed to be representing my interests as a board member and a part of the partnership has fulfilled his fiduciary responsibility to me or t[o] the partnership.

3 - I do not believe the Texas Securities Act provision for rescission requires me to give you a global release, or a one-sided release, to absolve you of all your actions in this matter beyond the sale of the securities.

4 - I think all partners accepting the rescis[s]ion should be given a release by St. Luke[']s as the rescis[s]ion means they were never partners and should not have any liability for any matters pertaining to this project.

5 - All board members, including myself, should get a similar release as well as full indemnity because if we were never partners we would never have been board members either, and we have acted in good faith.

Shah alleged that, almost immediately thereafter, he accepted the rescission offer.

## III. Shah's suit against Remels

In July 2014, while Patel's 2011 suit against the Partnership was pending, Shah intervened in it as a plaintiff. All claims involving Shah were then severed into a new cause. In April 2015, the trial court awarded Shah a summary judgment on his contract claim against the Class B partner for breaching the partnership agreement by entering into a loan to fund the rescission of Class A partnership interests. In May 2015, Shah added Remels as a defendant for the first time in his Second Amended Petition.

8

While there were claims pending between Shah and other parties, Shah and Remels agreed to a joint nonsuit without prejudice as to all claims between Shah and Remels. The trial court reduced the nonsuit to an order dated September 28, 2016. On January 6, 2017, Shah filed his "Withdrawal of Nonsuit and Supplemental Petition" against Remels, purporting to bring Remels back into the suit and to allege against Remels virtually all of the claims that had been pending against him at the time of the nonsuit. Shah contends, and Remels does not contend otherwise, that the trial court orally ruled that this pleading was effective to assert claims against Remels.

Then, Shah agreed to a "Joint Nonsuit with Prejudice" as to all claims involving all other defendants in his suit except for Remels, which the trial court reduced to a nonsuit order on June 12, 2017. The nonsuit order said that it "dismissed with prejudice all Plaintiffs' claims asserted in this lawsuit against Defendants, except for Plaintiffs' claims against Keith Remels which shall remain pending" and that Remels's claims against Shah would remain pending too.

In his live petition—his Fifth Amended Petition, filed February 2, 2018—Shah pleaded claims against Remels for "Negligence, Gross Negligence, and Negligent Misrepresentation"; "Fraud, Fraud in the Inducement, Duress, and Fraud by non-disclosure"; "Breach of Fiduciary Duty, Unjust Enrichment, Civil

Conspiracy, aiding and abetting & assisting and participating in a conspiracy"; and violations of the Deceptive Trade Practices Act ("DTPA").

Specifically, Shah alleged that Remels acted negligently as the attorney for the Partnership and some of the partners, including Shah, that he "knew or should have better known the terms[,] conditions and implications of the Partnership's agreements and the Partnership's capital accounts," and that his "failure to do so was either a result of incompetence, or malicious intent." Shah alleged that Remels fraudulently represented that the rescission offer was adequately funded and was within the Partnership's authority to enter into. He also alleged that Remels falsely represented the deadline for Shah to agree to the rescission offer, the Partnership's true ownership, the Class A shares' value, and the consequences of not agreeing to rescind.

Shah further asserted in his live pleading that Remels "failed to disclose that he represented some of the Partners in the Partnership in addition to" Shah and others, creating a "severe conflict of interest." Shah alleged that, as his counsel, Remels gave him "legal advice . . . regarding his personal liability" but did not do so "in a transparent and ethical manner." He also alleged that Remels "unjustly enrich[ed] himself, at the detriment of his clients," including Shah. And he alleged that Remels conspired with parties who are no longer in the suit to "push Shah and Krishna and the other class A physicians out of the Partnership." Finally, Shah

10

alleged that Remels's "conduct constitutes false, misleading and deceptive acts and practices pursuant to and in violation of the DTPA," citing various subsections that he asserted Remels violated.

As to his injuries, Shah alleged that he was induced to part with his Class A units at a value artificially below their actual worth. First, Shah alleged that a loan that the Partnership procured to fund the rescission offer made to the Class A unit-holders was an *ultra vires* act and therefore violated the Partnership's partnership agreement. Without the loan funds, Shah alleges, the Partnership could not have complied with securities laws requiring any funds supporting a rescission to be in escrow before the rescission is made.

Shah further alleged that the rescission offer was based on the Partnership's valuation of the Class A units at $5,000 each, due solely to "blockage rights." That is, an assumption underlying the valuation was that Class A unit-holders were able to block only certain actions that the Class B unit-holder may wish to take under the Partnership Agreement.

Shah's affidavit was attached to his summary-judgment response. In it, he averred that he first learned of the ineffectiveness of the loan and escrow in February 2015. According to Shah, the assumption that the Class A unit-holder could block only certain actions by the Class B unit-holder turned out to be untrue. He averred that, in July 2015 and during this suit, he learned for the first time that

the Class B unit-holder had never funded its units. According to Shah, this meant that the Class B unit-holder arguably should have been unable to exercise any voting power in the Partnership. If so, then not only did the Class A unit-holders have certain management rights that could withstand capital-call-induced dilution, but they also in reality controlled the Partnership in its entirety because the Class B unit-holder's failure to make its required capital contributions meant that it could not exercise any voting power. Therefore, when the Class B unit-holder later made a $10 million capital call, it could have been blocked, Shah alleges, by even a single Class A unit-holder who had not agreed to rescind. Shah alleges that Remels's conduct toward him led him to part with his Class A units, which were actually much more valuable than the rescission offer represented they were, which itself expressly relied on the possibility of future ownership-diluting capital calls.

Remels moved for summary judgment on all of Shah's claims, contending that the statute of limitations barred them. Remels argued that, even as modified by the discovery rule, Shah's claims accrued no later than Shah's exchanges with Remels and others in the June 2011 email chain. For purposes of summary judgment, Remels also assumed without conceding that he was Shah's attorney.

The court granted summary judgment in favor of Remels, and Shah now appeals. Shah contends that Remels's summary-judgment evidence was

insufficient to show that Shah had discovered, or should have discovered, his claims against Remels by the time of the email chain.[2]

<h3 style="text-align:center">Limitations and the Discovery Rule</h3>

In his sole issue, Shah contends that the trial court erred in granting Remels's motion for summary judgment based on his limitations affirmative defense because he did not carry his summary-judgment burden to negate the discovery rule.

## I.      Standard of review and applicable law

We review a grant of summary judgment de novo. *Schlumberger Tech. Corp. v. Pasko*, 544 S.W.3d 830, 833 (Tex. 2018) (per curiam). The motion for summary judgment must state the specific grounds relied upon to support the summary judgment. *See* TEX. R. CIV. P. 166a(c); *Parker v. Valerus Compression Servs., LP*, 365 S.W.3d 61, 65 (Tex. App.—Houston [1st Dist.] 2011, pet. denied).

---

[2]     Remels contends that Shah abandoned all of his fraud claims by merely making a passing reference to "fraud" in his opening brief and by failing to "assert[] with any precision that he was not on notice of his fraud claim on June 17, 2011." Remels also argues that Shah "abandoned" his DTPA claims and that they are "irrelevant" to this appeal. We disagree because we do not read Shah's summary-judgment response or appellate brief so narrowly. Shah's response and opening brief focused in large part on his argument that Remels failed to carry his initial summary-judgment burden to negate the discovery rule as to all of Shah's claims. Shah's argument, in effect, is that the email chain does not conclusively negate the discovery rule no matter which of his claims is analyzed. Shah sufficiently advanced this argument at summary judgment and in his appellate briefs.

Summary judgments must stand on their own merits: a nonmovant's failure to respond cannot supply by default the proof necessary to establish the movant's right to judgment as a matter of law. *Amedisys, Inc. v. Kingwood Home Health Care, LLC*, 437 S.W.3d 507, 511–12 (Tex. 2014).

We review the summary-judgment record in the light most favorable to the nonmovant, indulging every reasonable inference, and resolving all doubts, against the motion. *Schlumberger Tech.*, 544 S.W.3d at 833. A defendant moving for summary judgment on his or her limitations affirmative defense bears the burden of conclusively establishing the elements of that defense. *Id.*; *Rhône-Poulenc, Inc. v. Steel*, 997 S.W.2d 217, 223 (Tex. 1999); *see* TEX. R. CIV. P. 166a(b)–(c). This includes conclusively establishing when the cause of action accrued. *Schlumberger Tech.*, 544 S.W.3d at 833–34. Absent a tolling rule like the discovery rule, a cause of action ordinarily accrues when "a wrong must have occurred causing a legally cognizable injury." *See BP Am. Prod. Co. v. Marshall*, 342 S.W.3d 59, 65 (Tex. 2011); *United Healthcare Servs., Inc. v. First St. Hosp. LP*, 570 S.W.3d 323, 335 (Tex. App.—Houston [1st Dist.] 2018, pet. filed).

The date a cause of action accrues is normally a question of law. *Hooks v. Samson Lone Star, Ltd. P'ship*, 457 S.W.3d 52, 57–58 (Tex. 2015) (citing *Etan Indus., Inc. v. Lehmann*, 359 S.W.3d 620, 623 (Tex. 2011) (per curiam)). When there are allegations of fraud, however, "limitations does not start to run until the

14

fraud is discovered or the exercise of reasonable diligence would discover it," and the question of reasonable diligence is an issue of fact. *Id.* at 57 (stating that "a person cannot be permitted to avoid liability for his actions by deceitfully concealing wrongdoing until limitations has run" and that "fraud vitiates whatever it touches"). Therefore, there are some circumstances in which reasonable diligence is an issue of fact and cannot be determined as a matter of law. *See id.* at 61 (holding that fraudulent misrepresentations extended to public records and therefore earlier inconsistent records could not be used to establish as matter of law that plaintiff did not exercise reasonable diligence and determining that question of reasonable diligence had to be considered by factfinder).

When, as here, the plaintiff pleads the discovery rule, the defendant moving for summary judgment on limitations bears the additional burden of negating the rule. *Schlumberger Tech.*, 544 S.W.3d at 834; *Rhône-Poulenc*, 997 S.W.2d at 223. Defendants may accomplish this by conclusively establishing either (1) that the discovery rule does not apply or, (2) if the rule applies, that the summary-judgment evidence negates it. *Schlumberger Tech.*, 544 S.W.3d at 834.

A defendant moving for summary judgment negates the discovery rule by proving as a matter of law that there is no genuine issue of material fact about when "the plaintiff [knew], or through the exercise of reasonable care and diligence should have discovered, the nature of his injury and the likelihood that it

15

was caused by the wrongful acts of another." *Pirtle v. Kahn*, 177 S.W.3d 567, 571 (Tex. App.—Houston [1st Dist.] 2005, pet. denied); *accord Glassdoor, Inc. v. Andra Grp., LP*, —S.W.3d—, 2019 WL 321934, at *5 (Tex. Jan. 25, 2019); *Schlumberger Tech.*, 544 S.W.3d at 834 (citing *S.V. v. R.V.*, 933 S.W.2d 1, 4 (Tex. 1996)); *KPMG Peat Marwick v. Harrison Cty. Hous. Fin. Corp.*, 988 S.W.2d 746, 748 (Tex. 1999); *Kingsbury v. A.C. Auto., Inc.*, No. 01-14-00205-CV, 2015 WL 1457538, at *6 (Tex. App.—Houston [1st Dist.] Mar. 26, 2015, no pet.) (mem. op.). Making this showing "does not turn on whether the injured person knows the exact identity of the tortfeasor or all of the ways in which the tortfeasor was at fault in causing the injury. Nor does it turn on when the full effects of the injury became known or developed." *Schlumberger Tech.*, 544 S.W.3d at 834 (internal citation omitted). "Texas law has never required that a plaintiff know all the essential facts before a cause of action exists. To the contrary, a cause of action accrues for limitations purposes when a claimant learns of an injury, even if the rest of the essential facts are unknown." *In re Jorden*, 249 S.W.3d 416, 422 (Tex. 2008) (orig. proceeding); *accord Schlumberger Tech.*, 544 S.W.3d at 835.

Once the movant makes the required showing, the burden then shifts to the nonmovant to show that there exists a genuine issue of material fact sufficient to preclude summary judgment. *KPMG Peat Marwick*, 988 S.W.2d at 748; *Marchal v. Webb*, 859 S.W.2d 408, 412 (Tex. App.—Houston [1st Dist.] 1993, writ denied);

*see* TEX. R. CIV. P. 166a(c). A genuine issue of material fact exists when reasonable and fair-minded jurors could differ in their conclusions in light of all the summary-judgment evidence. *Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 755 (Tex. 2007) (per curiam). If the movant does not "conclusively establish[] its . . . defense," then the burden does not shift to the nonmovant, and the nonmovant need not respond or present any evidence. *See Amedisys*, 437 S.W.3d at 511–12 (citing *State v. Ninety Thousand Two Hundred Thirty-Five Dollars and No Cents in U.S. Currency*, 390 S.W.3d 289, 292 (Tex. 2013); *Rhône-Poulenc*, 997 S.W.2d at 222–23; and *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678–79 (Tex. 1979)).

The causes of action pleaded by Shah in his live petition involve either two- or four-year limitations periods. *See* TEX. CIV. PRAC. & REM. CODE § 16.003(a) (providing two-year limitations period for torts); *id.* § 16.004(a)(4)–(5) (providing four-year statute of limitations for fraud and breach of fiduciary duty); *id.* § 16.051 (providing four-year residual statute of limitations); TEX. BUS. & COM. CODE § 17.565 (providing two-year statute of limitations for DTPA claims); *G.T. Leach Builders, LLC v. Sapphire V.P., LP*, 458 S.W.3d 502, 516 n.9 (Tex. 2015) (applying two-year statute of limitations from section 16.003(a) to plaintiff's negligence claims); *HECI Expl. Co. v. Neel*, 982 S.W.2d 881, 885 (Tex. 1998) (applying two-year limitations period to negligent misrepresentation claim); *Willis*

*v. Maverick*, 760 S.W.2d 642, 644 (Tex. 1988) ("A cause of action for legal malpractice is in the nature of a tort and is thus governed by the two-year limitations statute.").

## II. Summary judgment on limitations

Shah alleged, among other causes of action, claims for negligence, gross negligence, fraud, and breach of fiduciary duty. Remels moved for summary judgment on the ground that the statute of limitations barred all of Shah's claims. Because Shah pleaded the application of the discovery rule, Remels was required to negate its application as a matter of law to establish his entitlement to summary judgment.

Remels does not contend that the discovery rule does not apply to Shah's causes of action. Rather, Remels asserts that he conclusively negated the discovery rule by proving as a matter of law that there is no genuine issue of material fact about when Shah knew, or through the exercise of reasonable care and diligence should have discovered, the nature of his injury and the likelihood that it was caused by Remels's wrongful acts. *See Pirtle*, 177 S.W.3d at 571.

Remels argued in his motion for summary judgment that the June 2011 email chain conclusively established the accrual date of Shah's claims under the

discovery rule.[3] Indeed, Remels began the "Factual Background" section of his motion for summary judgment with: "The only facts needed to dispose of this case relate to an e-mail exchange that began on June 16, 2011, and culminated on June 17, 2011, between Dr. Shah and Mr. Remels (though others were also on the e-mail chain)." And his summary-judgment reply argued that Shah's "claims—however they are framed—accrued, at the latest, with those e-mails in June 2011."

Remels, as the summary-judgment movant, bore the burden to negate the discovery rule by supplying the necessary evidence. *See Schlumberger Tech.*, 544 S.W.3d at 834; *Amedisys*, 437 S.W.3d at 511–12; *Rhône-Poulenc*, 997 S.W.2d at 223. He relied exclusively on the contents of the June 2011 email chain to establish that, by the time of the email chain, Shah knew "or through the exercise of reasonable care and diligence should have discovered, the nature of his injury and

---

[3] In his motion for summary judgment and in his briefing on appeal, Remels argues that Shah's pleadings are improperly fractured legal malpractice claims. *See, e.g.*, *Greathouse v. McConnell*, 982 S.W.2d 165, 171–72 (Tex. App.—Houston [1st Dist.] 1998, pet. denied) (indicating that when plaintiff alleges multiple causes of action against attorney but "crux" of each claim is that attorney did not provide adequate legal representation, courts should construe causes of action as claims for professional negligence or legal malpractice). Shah asserts, however, that the fracturing argument is irrelevant to this appeal because the outcome turns on whether Remels met his burden of proving when Shah discovered his claims. Remels responded that Shah's relevance assertion is "nonsense," but he failed to explain what impact, if any, our analysis of his fracturing argument would have on proving that he met his summary-judgment burden here. Accordingly, we agree with Shah and decline to address the fracturing arguments at this stage of the litigation. Whether Shah's claims have a two-year or four-year limitations period, Remels was required to conclusively negate the application of the discovery rule.

19

the likelihood that it was caused by the wrongful acts of another."[4] *See Pirtle*, 177 S.W.3d at 571; *accord Glassdoor*, 2019 WL 321934, at *5; *Schlumberger Tech.*, 544 S.W.3d at 834 (citing *S.V.*, 933 S.W.2d at 4); *KPMG Peat Marwick*, 988 S.W.2d at 748; *Kingsbury*, 2015 WL 1457538, at *6. We must read the email chain in the light most favorable to Shah, the nonmovant. *See Schlumberger Tech.*, 544 S.W.3d at 833.

The email chain begins with Shah's June 16, 2011 response to the rescission offer sent to him by Remels on June 10, 2011. Shah asked Remels to "clarify" whether the rescission offer's deadline of July 11, 2011, was the correct deadline or whether June 17, 2011, was the applicable deadline, as the Securities Group had communicated to Shah on June 16, 2011. Shah asked for Remels's answer "ASAP."

Remels called Shah the next day and then summarized their phone call in the email chain. Remels wrote that he told Shah by phone that he was not his attorney

---

[4] Remels's brief refers to other facts beyond the email chain's contents. We read those facts, however, as simply informing Remels's understanding of the email chain. Remels's argument, in the trial court and on appeal, is that the accrual date for Shah's claims is June 17, 2011, which is the last date of the email chain. Remels's argument on appeal from Shah's pre-intervention discussions with Patel and from minutes of meetings of the Board were not part of the summary-judgment record that Remels's motion or reply in support relied on, so they do not constitute any evidence in support of carrying Remels's burden to conclusively negate the discovery rule. *See* TEX. R. CIV. P. 166a(c); *Parker v. Valerus Compression Servs., LP*, 365 S.W.3d 61, 65 (Tex. App.—Houston [1st Dist.] 2011, pet. denied) (motion must state specific grounds relied upon for summary judgment).

and that Shah "should seek independent counsel regarding" the rescission offer and "any consequence for delaying" in accepting the offer.

In response to this, Shah reasserted that he understood Remels to be his attorney, as part of Remels's alleged duties as "the Class A partner legal representative," so Shah demanded from Remels "a more clear and defined answer than what you have given me so far, because I am a Class A partner." Shah explained his confusion over the conflicting deadlines for the rescission offer to Remels: "The rescission offer you wrote says in black and white that we have 30 days, till July 11, 2011 to accept. I intended to use the full amount of time so I may have a proper attorney review of the rescis[s]ion offer. I believe you are familiar with my attorneys."

Remels responded by reiterating that he did not represent Shah and represented the Partnership only. Shah then appeared to entertain the conclusion that Remels was not representing him because of Remels's alleged "threats about 'consequences,'" his alleged "refusal to shed any light on the 5[-]year securities statute of limitations," and his alleged "misrepresentation about our agreement to give a release to the partners[]." The St. Luke's representative then seconded Remels, explaining that Remels did not represent Shah and that Shah should seek out his own attorney regarding the rescission offer.

In response, Shah again referred to the thirty-day deadline for the rescission offer and stated that he had intended to use that full period "so I may have a proper and thorough attorney review of the rescission offer. Mr. Remels is very familiar with my attorneys from their prior dealings, and perhaps that is why he has pulled this bait and switch." Shah concluded by describing his next course of action as being "[b]ased on [Remels's] actions and threats" and forcing him "to accept the rescission under duress." He reiterated, "I am accepting this rescission as a result of your non-responsiveness and threats." And he levelled against Remels the statement that "I do not believe that Mr. Remels who is also supposed to be representing my interests as a board member and a part of the partnership has fulfilled his fiduciary responsibility to me or t[o] the partnership."

We must compare the email chain's content with the "nature of [Shah's] injury" as alleged in Shah's live petition. *See Pirtle*, 177 S.W.3d at 571; *accord Glassdoor*, 2019 WL 321934, at *5; *Schlumberger Tech.*, 544 S.W.3d at 834 (citing *S.V.*, 933 S.W.2d at 4); *KPMG Peat Marwick*, 988 S.W.2d at 748; *Kingsbury*, 2015 WL 1457538, at *6. Shah alleged causes of action for negligence and gross negligence, and he alleged that, "[i]f not for Remels's misdeeds, . . . Shah and Krishna would not have lost his interests in the Partnership, and/or would have received 2000 times more than the . . . valuation

for their investment units in the Partnership." Shah further alleged, among other claims, a cause of action for fraud, asserting that,

> [i]f not for Remels['s] false representations as well as his material non-disclosures, . . . Shah by and through Krishna, as well as the other Class A partners would never have relinquished their stake in the Partnership and/or would have received nearly $10,000,000 each for their investment units.

> If not for Remels'[s] representations pertaining to the rescission deadline and the ruinous cash call, . . . Shah would not have been pressured into accepting the 2011 rescission (which he accepted under duress).

He continues: "If not for this conspiracy, Shah by and through Krishna would have remained in the Partnership . . . ."

Given all this, the nature of Shah's injury is that he parted with his partnership shares under a significantly lower assumed valuation based on Remels's and others' allegedly concealing underlying facts from Shah. The email chain, however, does not address the true value of the Class A units. Nothing in the email chain, when read in the light most favorable to Shah, can reasonably be read as indicating that he knew that he was about to give up assets worth significantly more than what he was going to receive for them under the rescission offer.

And Shah's statements in the email chain about the compressed and conflicting deadlines for accepting the rescission offer support for the conclusion that no "exercise of reasonable care and diligence" should have led Shah to discover how allegedly depressed the rescission price for his units was. He says in

23

the email chain that he learned on June 16, 2011, in a call from the Securities Group that he had to accept the rescission offer by the next day. He asked Remels whether that was true and conveyed that he had been planning on using the full thirty-day period for his attorney to review the offer. Viewed in the light most favorable to Shah, it is unreasonable to conclude that he should have had his personal attorney investigate the true value of his partnership shares in only about twenty-four hours. That attorney would have had to learn, in one day, the nature of Remels's alleged fraud and misrepresentation regarding the rescission deadline, the effect of the threatened cash call, and many other facts surrounding the Class B unit-holder's failure to have funded its units.

To be sure, a limitations summary-judgment movant need not show that the nonmovant knew or should have known of "the full effects of the injury" or "all the essential facts" of the injury. *See Schlumberger Tech.*, 544 S.W.3d at 834–35; *Jorden*, 249 S.W.3d at 422. But the email chain does not satisfy Remels's burden because it supplies no facts about the alleged undervaluation of the Class A units. The email chain may have made Shah suspicious about Remels's activities or motives, but nothing suggests that Shah's suspicions, if any, should have been directed toward the rescission offer's valuation assumptions. For all the email chain reflects of what Shah knew, he was being rushed into parting with Class A units that were no more valuable than what he had originally paid for them,

24

especially in light of the represented possibility that they would soon dramatically decrease in value after an ensuing dilutive capital call.

Additionally, Shah's summary-judgment affidavit creates a fact issue on discovering the alleged fraud and the nature of his injury because he averred that he only learned of the facts undermining the units' valuation in July 2015 or later. Nothing in the email chain, when read in the light most favorable to Shah, conclusively overcomes Shah's affidavit. For example, nothing in the email chain suggests that either Shah or his counsel reasonably could have learned of the facts of the Class B partner's failure to fund its units between June 16, 2011, when the Securities Group told him that his deadline to accept the rescission offer was the next day, and when he in fact accepted the rescission offer and parted with his Class A units almost immediately after the events of the email chain. So too with the facts underlying the alleged ineffectiveness of the rescission loan. The email chain does not conclusively show that Shah knew "or through the exercise of reasonable care and diligence should have discovered, the nature of his injury." Although the email chain shows some disagreement among the parties, there is no indication that Shah knew, or should have been able to learn of the alleged fraud or that his Class A units had been substantially undervalued due to circumstances that the Class B unit-holder, allegedly with Remels's help, had kept from him.

Remels relies on three cases in making his arguments, but none of the three support his position here. In *Span Enterprises v. Wood*, 274 S.W.3d 854 (Tex. App.—Houston [1st Dist.] 2008, no pet.), Amin and his entity, Span, invested in a partnership, which was represented by attorney Wood. *Id.* at 856. Amin and the partnership entered into a Preliminary Agreement to govern the terms of Amin's investment and the partnership's future repayment to Amin. *Id.* Wood later prepared a partnership agreement for Amin and the partnership to execute, but that agreement materially altered the investment-repayment terms from the Preliminary Agreement. *See id.* After entering into the partnership agreement and substituting Span as the limited partner in his place, Amin sought repayment of a portion of his investment under the partnership agreement. *Id.* As part of that effort, Amin sought to redeem Span's preferred partnership units in exchange for common units and a repayment amount. *See id.* Amin alleged that Wood and others kept from him the fact that the partnership agreement altered the Preliminary Agreement by diluting Amin's (or Span's) ownership in the partnership when he sought repayment of his investment, contrary to what the Preliminary Agreement had provided for. *See id.* Our court held that, even under the discovery rule, limitations on Amin's and Span's claims should run from the date the partnership agreement was signed, rather than the date, three years later, that Amin sought to redeem the preferred units. *Id.* at 860. This was because the nature of Amin's and Span's injury was

dilution of their ownership, which was accomplished by the terms of the partnership agreement rather than by the later redemption. Therefore, reasonable diligence required Amin and Span to discover their injuries from the time of the execution of the partnership agreement. Here, by contrast, nothing in the email chain suggests that the allegedly false undervaluing of Shah's Class A units was apparent from the email exchange over the rescission offer like Amin's and Span's ownership dilution was apparent from the terms of the partnership agreement that Amin signed.

In *Turner v. Pavlicek*, No. H-10-00749, 2011 WL 4458757 (S.D. Tex. Sept. 22, 2011), Turner's own pleading "allege[d] that he learned of the alleged wrongful sale of his property on June 12, 2006," and "that he disputed the sale with all defendants on that date." *Id.* at *13. His claims, filed in March 2010, were therefore time-barred under a two-year statute of limitations. *Id.* There is no similar admission in Shah's live pleading. Also, the nature of Turner's injury was that his land was improperly sold, so he sought by his suit "to clear his title to the land." *See id.* at *2. But the nature of Shah's injury is not only that he parted with his Class A units, but that he did so relying on allegedly false representations about the units' value. Thus, Turner would know of the nature of his injury as soon as he knew his land was sold, but Shah would not necessarily know of the nature of his

27

injury when he rescinded his unit purchase because the facts underlying their alleged undervaluation were allegedly kept from him.

Finally, in *Naples v. Lesher*, No. 06-13-00059-CV, 2014 WL 1856846 (Tex. App.—Texarkana May 8, 2014, no pet.) (mem. op.), Naples sued Lesher for cutting and selling timber and not paying Naples his alleged share of the proceeds. *Id.* at *4–5. Those claims accrued, even under the doctrine of fraudulent concealment, when Naples's attorney wrote Lesher a letter saying that he had "discovered" that timber had been cut and that he suspected Lesher of having done it. *Id.* at *6. The court held that limitations began running no later than the date of that letter. *Id.* Like in *Turner*, the nature of Naples's injury was simply the loss of the timber without any compensation. The nature of Naples's injury lacked a further necessary component like the alleged undervaluation of Shah's Class A units, which reasonable diligence would not have allowed Shah to discover in one day beginning on June 16, 2011. The three cases relied on by Remels do not advance his position.

We therefore conclude that Remels failed to carry his summary-judgment burden to conclusively negate the discovery rule. *See* TEX. R. CIV. P. 166a(b)–(c); *Schlumberger Tech.*, 544 S.W.3d at 833–34; *Rhône-Poulenc*, 997 S.W.2d at 223. Therefore, the summary-judgment burden did not shift to Shah. *See Amedisys*, 437 S.W.3d at 511–12 (citing *Ninety Thousand Two Hundred Thirty-Five Dollars and*

28

*No Cents in U.S. Currency*, 390 S.W.3d at 292; *Rhône-Poulenc*, 997 S.W.2d at 222–23; *Clear Creek Basin Auth.*, 589 S.W.2d at 678–79). Accordingly, we sustain Shah's sole issue.

## Conclusion

We reverse the part of the trial court's summary judgment dismissing all of Shah's claims against Remels.[5] We remand the case for further proceedings consistent with this opinion.

Richard Hightower
Justice

Panel consists of Chief Justice Radack and Justices Higley and Hightower.

---

[5] Because Shah assigned no error to the trial court's summary judgment as to the law firm Dow, Golub, Remels & Gilbreath, PLLC, we note that our judgment leaves undisturbed that portion of the trial court's summary judgment order.